[No. G031944. Fourth Dist., Div. Three. Apr. 20, 2004.]

JACK W. MILLIKAN, as Trustee, etc., Plaintiff and Respondent, v. AMERICAN SPECTRUM REAL ESTATE SERVICES CALIFORNIA, INC., Defendant and Appellant.

**COUNSEL**

Grant, Genovese & Baratta, David C. Grant and Ronald V. Larson for Defendant and Appellant.

Stradling, Yocca, Carlson & Rauth, Donald J. Hamman and Jason A. Oesterreich for Plaintiff and Respondent.

**OPINION**

**IKOLA, J.—** ▮ Defendant contends that when a landlord sells leased property after the tenant has abandoned the lease, the landlord may not recover from the tenant expenses incurred in selling the property. We conclude the law does not impose that blanket prohibition. Instead, the landlord's entitlement to recover selling expenses from a breaching tenant depends upon the evidence adduced in a particular case, as is true with respect to other expenses incurred by the landlord in mitigating damages, and as is true generally when calculating damages from breach of contract. In this case, substantial evidence supports the court's award of selling expenses to the landlord. Accordingly, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

Defendant, American Spectrum Real Estate Services California, Inc. (defendant), entered into a lease with plaintiff, Jack W. Millikan, as trustee of the Millikan Family Trust/MEP (plaintiff), by which defendant leased an entire office building from plaintiff for a term of five years commencing on December 22, 1998. After only three years, defendant abandoned the property, making its last rent payment for the month of December 2001. The unfulfilled lease called for a base monthly rent of $12,462.29 during 2002 and $12,802.85 during 2003. The premises were also encumbered by a secured loan on which plaintiff was required to pay $6,071.49 per month.

When defendant abandoned the property, plaintiff listed the property for sale or lease.[1] But plaintiff received no offers to lease the property, so it was eventually sold for $1,217,502. Escrow closed on August 13, 2002. In connection with the sale, plaintiff incurred a $57,000 prepayment penalty on his loan, a sales commission of $73,050.12, and miscellaneous closing costs of $6,214.90. The total judgment of $270,785.21 (exclusive of costs and attorney fees) included an award of these selling expenses, which, with prejudgment interest, amounted to $141,491.62. Defendant's principal contention on appeal is that the court erred as a matter of law by awarding the selling expenses to plaintiff.

---

[1] We recognize the evidence is in conflict on this point. Defendant contended the property was listed solely for sale, and was never offered for lease. Plaintiff presented contrary evidence. Because we review "factual matters in the light most favorable to the prevailing party" (*Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619]), we resolve all conflicts in plaintiff's favor. (*Ibid.*)

## DISCUSSION

*The Sale of Property After a Tenant Terminates a Lease by Abandonment Does Not Deprive the Landlord of Its Contract Remedies for Breach of Lease*

■ Defendant contends: Section 1951.2 of the Civil Code[2] requires a landlord to mitigate damages after the lease is terminated by the tenant's abandonment of the premises; the landlord's sale of the property constitutes a breach of the duty to mitigate; and, therefore, expenses incurred in breaching the duty to mitigate are not recoverable against the tenant. Defendant's argument rests entirely upon its premise that the *only* way a landlord may mitigate damages upon the tenant's breach is to relet the property. We disagree both with defendant's premise and its proposed rule of law. While it is nearly always the case that a jilted landlord will attempt to mitigate damages by making reasonable efforts to relet the property, we find nothing in the law, or in reason, that would prohibit a landlord from selling the property to mitigate his loss, provided the trier of fact finds a sale to be a reasonable means to avoid the further loss of rental revenue.

We begin our analysis with the language of section 1951.2. "[I]f a lessee of real property breaches the lease and abandons the property before the end of the term . . . , the lease terminates."[3] Section 1951.2 continues by providing remedies for the landlord's loss of rental revenue, discussed *post*, even though the tenant's leasehold estate has been terminated.

■ Because it becomes important to our analysis of the out-of-state cases relied upon by defendant, we first note that termination of the lease upon abandonment by the tenant departs from the common law rule by which the lease terminated only upon a *surrender* of the lease term. At common law, a *surrender* of the lease could "be accomplished by an *express agreement* of the parties for cancellation or rescission of the lease. [Citations.] Surrender usually occur[ed], however, by *operation of law*, where the parties do something inconsistent with the continuance of the old estate, and an estoppel results." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 664, p. 848.) "Prior to the enactment of [section] 1951.2 in 1970 . . . , if, after abandonment by the tenant, the landlord reentered and took unqualified possession *for his own benefit*, a surrender occurred, and the tenant was

---

[2] All statutory references are to the Civil Code unless otherwise stated.

[3] Section 1951.4 provides an alternate remedy whereby the landlord may continue the lease in effect without termination, provided, however, the lease expressly allows this remedy. Section 1951.4 is not an issue in the instant case. Although the lease allowed a remedy under section 1951.4, the landlord elected to terminate the lease and exercise the remedy provided by section 1951.2.

released. [Citations.] [Section] 1951.2 changed the rule so as to permit the landlord to recover damages or rent after an abandonment." (*Id.* at § 665, p. 849.)

Describing section 1951.2, the court in *Danner v. Jarrett* (1983) 144 Cal.App.3d 164, 166–167 [192 Cal.Rptr. 535], commented, "[section 1951.2] is an admirable attempt to engraft the contract remedy of loss of bargain onto real property law. [Citation.] *It abrogates the common law rule that the lessee's obligation to pay rent depends on the continued existence of the term.* It encourages the lessor to mitigate damages by no longer requiring the reletting of the property to be for the benefit of the lessee. Its formula for damages permits the lessee to prove what rental loss could have been avoided."

■ Thus, section 1951.2 provides contract remedies to the landlord that would have been unavailable at common law upon termination of the lease by surrender or otherwise. These remedies are defined by the landlord's contract with its tenant, not by rules derived from the common law of real property. Specifically, upon termination of the lease by the tenant's abandonment before the end of the term, the landlord may recover: "(1) The worth at the time of award of the unpaid rent which had been earned at the time of termination; [¶] (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided; [¶] (3) [If the lease provides this remedy, or the premises were relet before the award], the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided; and [¶] (4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom." (§ 1951.2, subd. (a)(1)–(4).)

■ With one inapposite exception, notably absent from section 1951.2 is *any* requirement that the landlord take action to mitigate his damages in any particular way. The exception occurs in section 1951.2, subdivision (c)(2). The recovery of lost rental revenue accruing for the balance of the term after the date of judgment under section 1951.2, subdivision (a)(3) is conditioned upon the lease providing this remedy, or, if the lease does not provide this remedy, the property must actually be relet before the time of the award. And where future rents are sought based on an actual reletting of the property, the landlord must prove that "he acted reasonably and in a good-faith effort to mitigate the damages." (§ 1951.2, subd. (c)(2).)

■ But paragraph 13.2(a) of the lease in the instant case *does* allow the landlord's remedy under section 1951.2, subdivision (a)(3). Thus, section 1951.2, plainly paraphrased, and as applied to the instant case, provides that the landlord may recover *all* contract damages (adjusted to present value on the date of the award) caused by the tenant's breach, unless the tenant can prove that some or all of the rental loss could have been avoided. The statute refers to the "unpaid rent" as "such rental loss." By this phrasing of the statute, "rental loss" means the "unpaid rent."

Rental loss can be avoided in the traditional manner by reletting the premises. If the landlord is not diligent in doing so, the tenant can meet its burden of proving avoidable rental loss by offering evidence, for example, of the existence of a vibrant marketplace of potential tenants willing to bid up the price on a limited supply of equivalent rental space. But we find no language in the statute, or in any other authority, requiring that a rental loss be avoided solely by offsetting rental revenues.

■ If the property is sold, other means are available by which the tenant may prove avoidable rental loss. Most commonly, if one assumes the income-producing property is sold at its fair market value, the sale price is "the capitalized value of the reasonable net rental value attributable to the land and existing improvements." (Evid. Code, § 819.) The appropriate market capitalization rate could be established by reviewing sales of *comparable* leased premises. With an assumed capitalization rate based on the sales of comparable properties, and the known sale price for the subject building, the equivalent rental stream may be determined and compared with the rental loss resulting from the tenant's abandonment. By this means, the tenant may establish whether the landlord has recovered his lost rental, in whole or in part, by a favorable sale. While this evidence would necessarily require expert opinion testimony, it is the type of evidence often offered in other contexts where property valuations are in issue. And, of course, the tenant is also free to prove that a greater rental loss could have been avoided by retaining the building rather than selling it, or that the sale price was unreasonably low.

■ In *Willis v. Soda Shoppes of California, Inc.* (1982) 134 Cal.App.3d 899 [184 Cal.Rptr. 761], the tenant was permitted credit for the landlord's increased rents derived from a reletting of the abandoned property as against the landlord's consequential damages. But in doing so, the court declined to state the issue in terms of an offset. Rather, the court pointed out the calculation was "simply a method of determining the actual damages sustained by the lessor as a result of the breach." (*Id.* at p. 905.) The circumstances of the instant case should be no more difficult. The court must simply "determine[] the actual damages sustained by the lessor as a result of

the breach." (*Ibid.*) With the California remedy being firmly tethered to contract principles, the tenant should be held to perform the promise he made—to pay rent for the term, except to the extent he can prove the rental loss was avoidable. Sale of the property, by itself, does not excuse performance of the tenant's promise.

The out-of-state cases on which defendant relies are wholly inapt. As noted, in California, the landlord's remedies under section 1951.2 depart from principles derived from the common law of real property. The principal case cited by defendant, *Wilson v. Ruhl* (1976) 277 Md. 607 [356 A.2d 544], was decided by a Maryland court under Maryland law that required the landlord, upon the tenant's abandonment, either to "accept the abandonment, by reentry for his own benefit, and thereby effect a surrender which terminate[s] the tenancy altogether [or] reenter the premises for the account of the tenant, attempt to rerent on behalf of the tenant, holding the tenant liable for any accrued rent at the time of the reentry plus any deficiency in the event that the reletting was for a lower rent than the original rental." (*Id.* at p. 610.) *Wilson v. Ruhl* held that listing the property for sale was inconsistent with the duty to mitigate, reasoning that if the property had been sold "a surrender would have occurred because resale . . . is so inconsistent with the tenant's estate as to allow for no other interpretation than that the landlord had reentered in order to accept a surrender." (*Id.* at p. 611.) But Maryland did not have a statute such as section 1951.2. Under Maryland law, and under California law before 1971,[4] when the tenant's estate is terminated by surrender, the tenant owes no further obligation to the landlord. This is precisely the rule the California Legislature changed when it adopted section 1951.2. In California, despite the termination of the tenancy, the landlord retains his contract remedies. Defendant's other out-of-state cases are inapt for the same reason. Each of these authorities was decided under a rule of law abrogated in our state by section 1951.2.[5]

---

[4] See, e.g., *Dorcich v. Time Oil Co.* (1951) 103 Cal.App.2d 677, 683 [230 P.2d 10].

[5] *First Wisconsin Trust Co. v. L. Wiemann Co.* (1980) 93 Wis.2d 258, 272–273 [286 N.W.2d 360, 367] ("This court has held that when the landlord occupies the premises for his own use or takes exclusive possession, he accepts the tenant's surrender and terminates the lease, and he cannot collect rent which would have accrued under the lease subsequent to the surrender"); *Weil v. Segura* (1933) 178 La. 421, 425–427 [151 So. 639, 641] (After abandonment, plaintiff retook premises on behalf of the tenant and was required to account to the tenant. But when landlord sold the property, he converted the possession to his own account, terminating the lease and releasing the tenant from further obligation); *Richard v. Broussard* (La. 1986) 495 So.2d 1291, 1293 ("If the lessor elects to *cancel* the lease, the lease is terminated and the lessor is entitled to return into possession, but he forfeits the right to all future rentals"); *Noble v. Kerr* (1971) 123 Ga.App. 319 [180 S.E.2d 601] (Surrender not accepted by landlord until property was sold, at which time tenancy is terminated and tenant is not obligated for further rent); *Robinson v. Peterson* (Fla.Dist.Ct.App. 1979) 375 So.2d 294 (After abandonment by tenant, landlord retook premises for tenant's account. Landlord later sold property. Tenant is responsible for rent deficiency only through date of sale).

■    We hold, therefore, that sale of the property by the landlord following the tenant's abandonment of a lease does not deprive the landlord of its available contract remedies under section 1951.2. The landlord retains the right under section 1951.2 to claim rental loss accruing after the date of sale, except to the extent the breaching tenant can prove the rental loss was avoidable, together with consequential damages under subdivision (a)(4), under standard contract principles. The remaining question is whether the evidence supports the award made in this case.

*Substantial Evidence Supports the Judgment*

■    Plaintiff's selling expenses must be recovered, if at all, under section 1951.2, subdivision (a)(4), as consequential damages.    ■    The language of subdivision (a)(4) is identical to the language found in section 3300, which defines generally the measure of damages for breach of contract, and provides that the landlord may recover "for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom." (§ 1951.2, subd. (a)(4).) "[I]t has been held that [section 3300] incorporates the limiting rule of *Hadley v. Baxendale* [(1854) 156 Eng.Rep. 145]." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 815, p. 734; see, e.g., *Ericson v. Playgirl, Inc.* (1977) 73 Cal.App.3d 850, 854 [140 Cal.Rptr. 921]; *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40] (*Brandon & Tibbs*).) According to that "limiting rule," "if special circumstances caused some unusual injury, special damages are not recoverable therefor unless the circumstances were known or should have been known to the breaching party at the time he entered into the contract. The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting." (*Brandon & Tibbs, supra*, 226 Cal.App.3d at p. 456.)

But "[t]he existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. [Citation.] If, because of his own education, training, and information, he had reason to foresee the probable existence of such circumstances, the judgment for compensatory damages measured by the extent of such injury will be given against him." (*Brandon & Tibbs, supra*, 226 Cal.App.3d at p. 458.)

The question whether the defendant had reason to foresee the probable existence of circumstances that would cause plaintiff to sell the property to mitigate his damages after defendant's abandonment of the property is one of fact, which we review under the substantial evidence test. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925].)

Here, there is an abundance of substantial evidence to support the court's finding. Defendant was in the business of leasing, selling, and managing real estate. It was also the sole tenant in plaintiff's building, having leased the entire building. From this fact, and from defendant's special training and experience in leasing, selling, and managing real estate, the court could reasonably infer defendant had reason to know that plaintiff would not be able to bear the burden of a vacant building indefinitely, and that at some point it was reasonably probable plaintiff would elect to sell the building to stem further losses. After all, this was not a circumstance in which defendant was vacating one apartment out of 150. The entire building was suddenly abandoned with only one month's notice. Thus, the court had sufficient evidence from which it could find that sale of the building was a reasonably foreseeable consequence of defendant's breach.

Once the court concludes from the evidence that a sale was reasonably foreseeable and damages were shown with reasonable certainty, the burden is on defendant to prove the expenses incurred were unreasonable or unnecessary. "The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract. [Citations.] Inasmuch as the law denies recovery for losses that can be avoided by reasonable effort and expense, justice requires that the risks incident to such effort should be carried by the party whose wrongful conduct makes them necessary. [Citation.] Therefore, special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages." (*Brandon & Tibbs, supra,* 226 Cal.App.3d at pp. 460–461.)

Defendant offered no evidence at all to show the sale expenses could have been avoided, or that they were unreasonable in amount. Defendant rested its entire defense on the premise that sale expenses could not be recovered as a matter of law. We have rejected that premise, and substantial evidence supports the court's remaining factual determinations.

Finally, substantial evidence supports the court's implied finding that defendant's breach caused plaintiff to incur the selling expenses. Plaintiff testified he was not receiving rent, he was paying close to $7,000 per month, his goal was to get cash flow either from lease or sale, and when his partners "ran out of ready cash" after two months, he had to "assume the entire cost of carrying [the] building."

*Defendant's Other Contentions Are Without Merit*

Defendant contends the court erred by sustaining plaintiff's objection to a question asking plaintiff how much profit he made on the sale of the property. There was no error. Although we have held the sale price of the property, together with capitalization rates from comparable sales, may be used in the calculation of contract damages, plaintiff's profit on the sale of the building is wholly unrelated, and thus irrelevant, to the calculation of damages. Hypothetically, if plaintiff had owned the building for 10 years before defendant rented it, would defendant get credit for the previous 10 years of capital appreciation? To ask the question is to answer it.

Defendant's final contention is that the court awarded plaintiff the lost rent for the entire month of the sale, instead of prorating it. In view of our holding that plaintiff does not lose his claim for future lost rentals merely because he sold the property, plaintiff's final contention is without merit.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs on appeal.

Moore, Acting P. J., and Fybel, J., concurred.