Filed 12/24/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| POWERHOUSE MOTORSPORTS GROUP, INC., et al.,<br><br>  Plaintiffs and Appellants,<br><br>v.<br><br>YAMAHA MOTOR CORPORATION, U.S.A.,<br><br>  Defendant and Appellant. | 2d Civil No. B236705<br>(Super. Ct. No. CV098090)<br>(San Luis Obispo County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on November 26, 2013, be modified as follows:

On page 5, in the third full paragraph, the first sentence beginning "As a consequence of the Board's ruling," is deleted and replaced with the following: "As a consequence of Yamaha's actions, MDK cancelled its purchase of Powerhouse and Powerhouse was liquidated."

On page 11, in the third full paragraph, the second sentence beginning "Substantial evidence shows" is deleted and replaced with the following: "Substantial evidence shows that Yamaha informed Powerhouse that a sale could be approved even though the dealership had been closed, and that Yamaha refused to consider approval of the MDK sale despite its prior relationship with MDK and its receipt of information supporting approval of the sale."

[There is no change in the judgment.]

The petitions for rehearing are denied.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| POWERHOUSE MOTORSPORTS GROUP, INC., et al.,<br><br>  Plaintiffs and Appellants,<br><br>v.<br><br>YAMAHA MOTOR CORPORATION, U.S.A.,<br><br>  Defendant and Appellant. | 2d Civil No. B236705<br>(Super. Ct. No. CV098090)<br>(San Luis Obispo County) |

For over a decade, Powerhouse Motorsports Group, Inc. (Powerhouse) operated a successful retail motorcycle dealership under a dealer/franchise agreement (Franchise Agreement) with Yamaha Motor Corporation (Yamaha). In 2008, Powerhouse suffered a reversal of fortune and its owner Timothy Pilg closed the dealership in June of that year. With the apparent agreement and support of Yamaha, Pilg entered negotiations to sell the dealership and franchise to MDK Motorsports (MDK).

Without informing either Pilg or MDK and contrary to its stated position, Yamaha initiated procedures to terminate the Franchise Agreement pursuant to Vehicle Code section 3060.[1] Before Yamaha served Powerhouse with statutory notice of the termination, Powerhouse notified Yamaha it had reached an agreement to sell the dealership and franchise to MDK and asked Yamaha to approve the sale. Powerhouse

_____

[1] All statutory references are to the Vehicle Code, unless otherwise noted.

filed a protest to the notice of termination (§ 3060, subd. (b)(2)), and the New Motor Vehicle Board (the Board) subsequently granted Yamaha's motion to dismiss the protest as untimely. The Franchise Agreement was accordingly terminated, which led MDK to cancel its purchase of Powerhouse.

Powerhouse and Pilg[2] then filed this lawsuit alleging that Yamaha unreasonably withheld its consent to the sale of the dealership and franchise in violation of section 11713.3. The complaint also includes common law claims for breach of contract, intentional interference with contractual relations, and breach of the implied covenant of good faith and fair dealing. Powerhouse prevailed in a jury trial and recovered a total of $1,336,080 in compensatory and punitive damages. Yamaha appeals, contending that the Franchise Agreement was terminated by virtue of the section 3060 procedure and that such termination precludes Powerhouse from recovery on any of its claims. Yamaha also claims the compensatory damages are excessive, the punitive damages are improper, and that attorney fees were erroneously awarded. Powerhouse cross-appeals, contending the court erred in granting nonsuit on Pilg's section 11713.3 claim, and in failing to award the attorney fees it incurred in the administrative proceedings before the Board and Powerhouse's subsequent request for writ relief from the Board's decision.

We conclude that Powerhouse's right to seek and recover damages for Yamaha's unreasonable refusal to approve the sale of Powerhouse's dealership and franchise is not affected by Powerhouse's failure to comply with the section 3060 procedure for challenging Yamaha's termination of the Franchise Agreement (§§ 3050, subd. (e), 11713.3, subd. (d)(1)), nor by the Board's decision regarding the timeliness of Powerhouse's protest to the notice of termination. We further conclude that the jury's verdict is supported by substantial evidence and that the parties' remaining claims lack merit. Accordingly, we affirm the judgment.

FACTS AND PROCEDURAL HISTORY

---

[2] For convenience, we will refer to Powerhouse and Pilg collectively as Powerhouse unless otherwise specified.

2

For several years, Timothy Pilg operated a motorcycle and sport vehicle dealership under the Powerhouse name. In 1998, Pilg became a franchisee of Yamaha. The dealership grew and Powerhouse was incorporated in 2007. After incorporation Powerhouse entered into a new Franchise Agreement with Yamaha. Business, however, declined and Powerhouse closed its dealership on or about June 16, 2008. It never reopened.

After closing the dealership, Powerhouse began negotiations for the sale of the closed dealership, including the Yamaha franchise, to MDK. On June 19, 2008, Pilg contacted Rod Stout, a Yamaha division manager, and asked if Powerhouse could sell the franchise even though it had closed. Stout told Pilg that such a sale was possible.

On June 21, 2008, Powerhouse reached a verbal agreement with MDK for the sale of its assets and, on June 25, Powerhouse and MDK signed a written "term sheet" for the sale.[3] MDK was an existing and approved Yamaha franchisee operating at another location. On June 27, 2008, Pilg informed Luke Dawson, a Yamaha district manager, of the terms of the sale. When he informed Regional Sales Manager Rocky Aiello of the sale, Dawson obtained information regarding MDK and Yamaha began the process of approving MDK as a new franchisee. Stout informed Powerhouse that it remained a Yamaha dealer and that Yamaha would consider an application from MDK to transfer the franchise to MDK.

On July 10, 2008, Powerhouse, Yamaha and MDK representatives attended a meeting to discuss and expedite the sale. Dawson was Yamaha's representative. Pilg and the CEO of MDK attended the meeting along with other Powerhouse and MDK personnel. Dawson represented that he would expedite Yamaha's review and approval of the sale and transfer of the franchise. The possibility of entering into an agreement under which Powerhouse would reopen its dealership was discussed but not acted upon.

---

[3] Technically, the Powerhouse franchise would not be "sold" to MDK. Instead, Yamaha would issue a new franchise directly to MDK upon Yamaha's required approval of the transaction. As have the parties in their briefs, we will use the term "sale" in this opinion.

On July 18, 2008, Yamaha manager Stout stated that Yamaha would expedite the paperwork and that an interim reopening of the Powerhouse dealership was not necessary because MDK was an existing Yamaha franchisee in another location. On the same day, Powerhouse and MDK executed a formal agreement for the sale of the dealership to MDK.

At the same time as these negotiations were ongoing, and unbeknownst to Powerhouse or MDK, Yamaha began the section 3060 procedure for terminating the Franchise Agreement. The Franchise Agreement gives Yamaha the right to terminate if Powerhouse closed its operations for a period of seven consecutive days. (See also § 3060, subd. (a)(1)(B)(v).) On July 11, 2008, when Powerhouse had been closed for almost a month, Rocky Aiello signed an internal dealer cancellation request which was followed by a notice of termination of the Franchise Agreement as required by section 3060. The notice was misaddressed and not received by Powerhouse. Another notice of termination was sent on July 24, 2008, after the finalization of the Powerhouse/MDK sale agreement. Powerhouse received this notice on July 26, 2008.

The notice of termination complied with the requirements of section 3060. The notice triggered a statutory obligation on the part of Powerhouse to file a protest with the Board, a state agency created to enforce the Vehicle Code provisions. Section 3060, subdivision (b)(2) provides that, upon a timely protest by a dealer, a franchise may not be terminated without the approval of the Board.

On July 28, 2008, Pilg telephoned Richard Tilly, Yamaha's Senior Legal Counsel, regarding the notice of termination. Tilly was not aware of the pending sale to MDK and declined to discuss the termination notice. Tilly advised Pilg to contact an attorney. Tilly followed up with a letter to Powerhouse stating that Yamaha was not withdrawing or delaying the effectiveness of its notice of termination. Pilg e-mailed Dawson for an explanation but received no reply. Aiello was aware that Pilg did not understand the effect of the notice of termination and was seeking information from Yamaha.

4

MDK sent its franchise application package to Yamaha on August 5, 2008. The package was forwarded to Aiello and other Yamaha executives for review, but was never fully processed. On August 8, 2008, Yamaha attorney Tilly wrote to Pilg stating that submission of the Powerhouse/MDK agreement did not prevent application of the termination notice, and informed Pilg that the Franchise Agreement would terminate on August 9, 2008, because Powerhouse had failed to file a timely section 3060 protest.

Powerhouse filed a late protest to the notice of termination on August 15. Yamaha moved to dismiss the protest as untimely. The Board conducted a hearing on Yamaha's motion to dismiss and granted the motion, finding that the protest was untimely. The opinion of the administrative law judge recited the facts concerning the closure of the Powerhouse dealership, the sale of the dealership to MDK, and the conduct of Yamaha during the negotiation of the sale. The opinion concluded that Yamaha had the burden of establishing it had a good faith belief that Powerhouse had gone out of business, and that Powerhouse would not reopen the business even if the dealership were sold to MDK. The Board also found that Powerhouse had not established Yamaha should be barred on "estoppel" principles from challenging the timeliness of Powerhouse's protest.

As a consequence of the Board's ruling, MDK cancelled its purchase of Powerhouse and Powerhouse was liquidated. Pilg filed for bankruptcy in October 2009 and the trustee in bankruptcy, Jerry Namba, assumed control over the instant litigation.

Powerhouse filed its lawsuit against Yamaha in March 2009. Its operative complaint alleges four causes of action by Powerhouse against Yamaha: a violation of section 11713.3[4] (unreasonable withholding of consent to sale of franchise), intentional interference with contractual relations, intentional interference with prospective business advantage, and breach of contract and the covenant of good faith. It also alleges three causes of action by Pilg against Yamaha: violation of section 11713.3, interference with prospective business advantage, and intentional interference with contractual relations.

---

[4] See footnote 5, *infra*.

5

Powerhouse also petitioned for a writ of mandate to overturn the Board's decision on the timeliness of Powerhouse's protest.

The trial court denied the writ of mandate on July 2, 2010. The court found Pilg knew that closure of Powerhouse could lead to termination of his franchise, and that Powerhouse failed to establish that Yamaha had misled Powerhouse with respect to its need to protest Yamaha's notice of termination.

After the denial of Yamaha's motion for summary judgment, the case was tried by a jury in June 2011. During trial, the trial court granted Yamaha's motion for nonsuit on Pilg's section 11713.3 claim.

The jury found Yamaha liable on all remaining claims. The jury awarded Powerhouse $811,000 in compensatory damages and $140,000 in punitive damages, and awarded Pilg $325,080 in compensatory damages and $60,000 in punitive damages. The court awarded Powerhouse attorney fees with respect to the section 11713.3 claim but denied fees with respect to the administrative proceeding before the Board and Powerhouse's request for writ relief from the Board's decision.

Yamaha filed motions for a new trial and judgment notwithstanding the verdict. After both motions were denied, the parties filed timely notices of appeal and cross-appeal.

## DISCUSSION

### *Standard of Review*

Yamaha's principal contention is that the Franchise Agreement was terminated as a matter of law due to the closure of the Powerhouse dealership and Powerhouse's failure to file a timely protest pursuant to section 3060. We exercise our independent judgment in the review of pure questions of law, such as the interpretation of statutes, and application of a statute to undisputed facts. (*Phillips, Spallas & Angstadt, LLP v. Fotouhi* (2011) 197 Cal.App.4th 1132, 1138; *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.)

To the extent Yamaha challenges the jury verdict on evidentiary grounds, we review the judgment under the substantial evidence standard. (*Tesoro Del Valle*

6

*Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 634.)  We view the evidence in the light most favorable to the prevailing party, and resolve all conflicts in the evidence in favor of the judgment.  (*Ibid.*)  The jury has the power to give whatever weight it chooses to the evidence and we will not reweigh the evidence or redetermine credibility.  (*Ibid.*; *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931.)

### *The Board's Decision Does Not Preclude Powerhouse's Claims*

As stated, Yamaha contends the Franchise Agreement was terminated through the section 3060 protest procedure and that the termination and the Board's ruling preclude all Powerhouse and Pilg claims as a matter of law.  Yamaha argues that its termination of the Franchise Agreement left Powerhouse with nothing to sell and Yamaha with nothing to approve.  We conclude, as did the trial court, that the Board's decision regarding the timeliness of Powerhouse's section 3060 protest did not terminate the franchise as a matter of law and Yamaha remained bound by the mandate of section 11713.3 subdivision (d)(1) to act reasonably in considering the Powerhouse/MDK sale.

Section 3000 et seq. and section 11700 et seq. establish a statutory scheme regulating the franchise relationship between vehicle manufacturers and distributors, and their dealers.  (*Tovas v. American Honda Motor Co.* (1997) 57 Cal.App.4th 506, 512.)  The purpose of this scheme is "to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally."  (See Historical and Statutory Notes, 65B West's Ann. Veh. Code (2000 ed.) foll. § 3000, p. 371; *Tovas*, at pp. 512-513.)  The United States Supreme Court has recognized that the "disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some 25 States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers."  (*New Motor Vehicle Bd. v. Orrin W. Fox Co.* (1978) 439 U.S. 96, 100-101, fns. omitted.)

In regulating the relationship between manufacturers and distributors, section 11713.3 sets forth a list of unlawful acts, enables the Board to resolve certain

7

disputes, and allows licensees to sue for damages. (See *Mazda Motor of America, Inc. v. New Motor Vehicle Bd.* (2003) 110 Cal.App.4th 1451, 1458.) It provides, inter alia, that it is unlawful for a manufacturer or distributor "to prevent or require, or attempt to prevent or require" any dealer from selling or otherwise transferring its interest in a dealership franchise to another person. (§ 11713.3, subd. (d)(1).)[5] It further provides that a manufacturer or distributor may require its approval of a franchise sale but such approval "shall not be unreasonably withheld." (*Ibid.*) It is also unlawful for a manufacturer or distributor "[t]o prevent, or attempt to prevent, a dealer from receiving fair and reasonable compensation for the value of the franchised business." (*Id.* at subd. (e).)

Section 3050 gives the Board various "duties," and empowers the Board to "[c]onsider any matter concerning the activities or practices" of new motor vehicle manufacturers, distributors and dealers. (At subd. (c).) Under section 3050, subdivision (d), the Board has the power to "[h]ear and decide, within the limitations and in accordance with the procedure provided, a protest presented by a franchisee" pursuant to section 3060. Section 3060 provides that "no franchisor shall terminate or refuse to continue any existing franchise" unless certain conditions are met, and gives a franchisee the right to file a protest with the Board regarding termination. (At subd. (a)(1).) When a timely protest is filed, the franchise may not be terminated until the board makes its findings. (*Id.* at subd. (a)(2); *Tovas v. American Honda Motor Co., supra*, 57 Cal.App.4th at pp. 512-516.)

Although certain portions of sections 3050 and 3060 appear to give the Board broad authority to resolve distributor-dealer disputes, a series of appellate decisions have limited its power. *(Miller v. Superior Court* (1996) 50 Cal.App.4th 1665,

---

[5] Section 11713.3, subdivision (d)(1) provides in its entirety that it is unlawful for any manufacturer or distributor: "Except as provided in subdivision (t), to prevent or require, or attempt to prevent or require, by contract or otherwise, any dealer, or an officer, partner, or stockholder of a dealership, the sale or transfer of a part of the interest of any of them to another person. A dealer, officer, partner, or stockholder shall not, however, have the right to sell, transfer, or assign the franchise, or any right thereunder, without the consent of the manufacturer or distributor except that the consent shall not be unreasonably withheld."

1675; *Hardin Oldsmobile v. New Motor Vehicle Bd.* (1997) 52 Cal.App.4th 585, 590 (*Hardin*); *Mazda Motor of America, Inc. v. New Motor Vehicle Bd.*, *supra*, 110 Cal.App.4th at p. 1457.)  Specifically, language in section 3050, subdivision (c), giving the Board authority to "[c]onsider *any* matter concerning the activities or practices" (italics added) of a licensee, has been limited to authority to investigate, regulate licensing, and resolve disputes between the public and licensees.  (*Hardin,* at p. 590; *Mazda Motor of America,* at p. 1457.)  The delegation of greater powers to the Board would violate the judicial powers clause of the California Constitution.  (*Hardin,* at p. 598; *Mazda Motor of America,* at p. 1457.)

In addition, section 3050 was amended in 1997 to add subdivision (e), which expressly provides that "[n]otwithstanding subdivisions (c) and (d), the courts have jurisdiction over all common law and statutory claims originally cognizable in the courts" and "a party may initiate an action directly in any court of competent jurisdiction."  This amendment preserves the right of dealers and other licensees to file a civil action for all common law and statutory claims.  (See *Tovas v. American Honda Motor Co., supra,* 57 Cal.App.4th at p. 519; *DaimlerChrysler Motors Co. v. Lew Williams, Inc.* (2006) 142 Cal.App.4th 344, 352-353.)

Yamaha acknowledges limitations on the Board's jurisdiction and concedes that a dealer such as Powerhouse may file a civil action asserting statutory and common law claims without exhausting administrative remedies, and without filing a protest with the Board.  Yamaha further concedes that the Board did not have jurisdiction over Powerhouse's section 11713.3 statutory claim or its common law claims.

Yamaha argues, however, that the Board retains jurisdiction over a section 3060 protest under section 3050, subdivision (d), and that a dealer must file a timely section 3060 protest in order to prevent termination of its franchise and the loss of its right to assert other statutory and common law claims in a civil action.  In substance, Yamaha argues that section 3060 trumps all judicial and statutory limitations on the Board's authority and takes precedence over such limitations.

9

We agree that the Board retains jurisdiction to decide the timeliness of a dealer protest, but such a determination does not preempt or limit a dealers' section 11713.3 and common law rights. The Board appears to agree with us. In this case, the Board determined that the Powerhouse protest was late but did not assert jurisdiction to adjudicate Powerhouse's claims under section 11713.3 and general contract law. While section 3060 provides an expeditious method for terminating a franchise under certain circumstances, it does not preclude a civil action when the facts show unreasonable conduct by the franchisor in violation of other statutes and general contract law. Section 3050, subdivision (e) provides that "[n]otwithstanding subdivisions (c) *and (d)*, the courts have jurisdiction over all common law and statutory claims . . . ." (Italics added.)

The *Hardin* case provides a cogent and persuasive analysis of the pertinent issue prior to the enactment of section 3050, subdivision (e). *Hardin* addressed the earlier case of *Yamaha Motor Corp. v. Superior Court* (1986) 185 Cal.App.3d 1232, in which a Yamaha dealer filed a complaint for common law claims similar to those alleged by Powerhouse. In rejecting *Yamaha Motor Corp.'*s holding that the Board had jurisdiction over the dispute, the court in *Hardin* reasoned: "That a litigant must exhaust *administrative remedies* before seeking relief in the courts does not bestow upon the administrative agency the jurisdiction to consider and resolve *all common law and statutory remedies*. Prior resort to the administrative agency does not take away from the litigant the right to allege and prove claims not under the jurisdiction of the agency and does not expand the jurisdiction of the agency to hear and consider those claims." (*Hardin, supra,* 52 Cal.App.4th at p. 593.)

The *Hardin* court concluded that the Board's jurisdiction under section 3050, subdivision (d), allowed the Board to hear and consider protests only "*within the limitations and in accordance with the procedure provided*" in section 3060. (*Hardin, supra*, 52 Cal.App.4th at p. 593.) The court reasoned that this statutory limitation did not give the Board jurisdiction to consider common law or statutory claims merely because some facts forming the foundation for such claims can be asserted as part of a statutory protest claim under section 3060. (*Id.* at pp. 593-594.)

10

We also find unpersuasive Yamaha's argument that the Board's decision rejecting Powerhouse's claim is entitled to substantial deference. The authority of the Board to consider similar arguments does not expand its constitutional jurisdiction. Also, the degree of "respect" accorded the agency's interpretation depends on the circumstances. An administrative agency's interpretation of a statute is entitled to significant deference only if "'. . . the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. . . .'" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7, 12.) Here, the ruling did not require technical knowledge and was not obscure, complex or entwined with other issues.

Yamaha relies on *Sonoma Subaru, Inc. v. New Motor Vehicle Bd.* (1987) 189 Cal.App.3d 13 for the proposition that a notice of termination must be treated as final and effective when a timely protest is not filed by the dealer. In *Sonoma Subaru*, the court refused to incorporate a "good cause" exception to the section 3060 time deadline because it would frustrate the intent of the Legislature. (*Id.* at pp. 20-22.) Nothing in the opinion, however, supports the conclusion that the expedited protest procedure set forth in section 3060 gives the Board authority to resolve common law and statutory claims involving a substantive dispute between a franchisor and franchisee. As *Hardin* clearly states, "The jurisdiction of the New Motor Vehicle Board [ ] has limits." (*Hardin, supra*, 52 Cal.App.4th at p. 587.) Jurisdiction to resolve such disputes is with "any court of competent jurisdiction." (§ 3050, subd. (e).)

*Substantial Evidence Supports the Jury's Factual Findings*

Substantial evidence supports the jury's factual findings that Yamaha unreasonably withheld its consent to Powerhouse's sale of the Franchise Agreement to MDK. Substantial evidence shows that Yamaha repeatedly informed Powerhouse that a sale could be approved despite the section 3060 proceedings, but refused to consider approval of the MDK sale despite a prior franchisor-franchisee relationship between Yamaha and MDK and the submission of substantial documentation supporting approval of the sale. In fact, Yamaha does not offer substantial argument to the contrary and,

11

instead, relies on its position that the Franchise Agreement was terminated in its entirety when Powerhouse failed to file a timely protest under section 3060.

### No Instructional Error

Yamaha argues that it is entitled to a new trial because the trial court failed to instruct the jury on the effect of Powerhouse's failure to file a timely protest of Yamaha's notice of termination. We disagree.

Upon request, a trial court must give the jury correct, nonargumentative instructions on every theory of the case supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) "Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.)

Yamaha's proposed jury instruction began with a summary of the section 3060 notice of termination and protest procedure but continued by stating: "Yamaha is allowed to end its relationship with [a] dealer after it receives the Notice of Termination, if the dealer fails to file a timely protest with the Board. . . . [¶] Plaintiffs failed to file a timely protest with the Board . . . and Plaintiffs' Yamaha Dealer Agreement was terminated at that time." The trial court concluded that this language was not neutral, and gave an instruction regarding the section 3060 procedure without language stating that the Franchise Agreement "was terminated" when Powerhouse failed to file a timely protest. We agree with the trial court that Yamaha's proposed instruction was argumentative and that the instruction actually given fully and adequately instructed the

12

jury on the relevant law.[6]  (See *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217.)

*Contract Claim Not Barred by Material Breach by Powerhouse*

Yamaha contends the closure of the Powerhouse dealership constituted a material breach of the Franchise Agreement that barred Powerhouse's claim for breach of contract and the implied covenant of good faith and fair dealing.  We disagree.

The law implies in every contract a covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefits of the contract.  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) The covenant cannot impose duties beyond the express terms of the contract, but, when a contract gives one party a discretionary power affecting the rights of the other, that party must exercise its discretion in good faith and in accordance with fair dealing. (*Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 106.)

The closure of the Powerhouse dealership is specified in the Franchise Agreement as a ground for termination, but section 11713.3 prohibits Yamaha from taking action to prevent Powerhouse from selling its franchise and imposes a duty on Yamaha to act reasonably in connection with a sale.  Here, substantial evidence supports the jury's finding that Yamaha acted in bad faith by encouraging Powerhouse to complete a sale to MDK, representing that it would consider the sale even if consummated after the

---

[6] The jury was instructed: "When a distributor wishes to terminate a dealer agreement (aka franchise) it is required by law to give a Termination Notice that conforms to Vehicle Code section 3060.

"The first page of the written notice shall contain the following statement:

'NOTICE TO DEALER: You have the right to file a protest with the NEW MOTOR VEHICLE BOARD in Sacramento and have a hearing in which you may protest the termination of your franchise under provisions of the California Vehicle Code. You must file your protest with the board within 10 calendar days after receiving this notice or within 10 days after the end of any appeal procedure provided by the franchisor or your protest right will be waived.'

"A dealer wishing to challenge the franchise termination has the right to have the propriety of the termination reviewed by the New Motor Vehicle Board.  In order to obtain review by the New Motor Vehicle Board the dealer must file a protest with the New Motor Vehicle Board within the time period for a protest stated in the Termination Notice.  In this case that period was 10 days."

13

closure of Powerhouse's dealership, and informing Powerhouse that a reopening of its dealership was not required to obtain Yamaha's approval.

*Intentional Interference with Contractual Relations*

Citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 (*Applied Equipment*), Yamaha contends that it cannot be sued for interference with the proposed Powerhouse/MDK contract because it was not a "stranger" to that contract. Yamaha argues that the claim is barred because Yamaha had a legitimate interest in the contract based on its right to approve a successor dealer and as the distributor of Yamaha products to a new franchisee. We disagree.

The tort of intentional interference with contractual relations requires (i) a contractual relationship between a plaintiff and a third party, (ii) defendant's knowledge of the contract, (iii) defendant's intent to disrupt performance of the contract, and (iv) conduct by defendant preventing performance of the contract. (CACI No. 2201; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) In *Applied Equipment*, our Supreme Court held that "the tort cause of action for interference with a contract does not lie against a party to the contract." (*Applied Equipment, supra,* 7 Cal.4th at p. 514.) But, the court also stated that the duty not to interfere with the contract "falls only on strangers-interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Ibid.*) Yamaha argues that *Applied Equipment* should be extended to include nonparties such as Yamaha who have a "legitimate interest in the scope or course of the contract's performance."

In *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, the court acknowledged this broader language in *Applied Equipment*, but declined to extend the holding of that case which excluded only parties to the contract from asserting an intentional interference claim. *Woods* stated that *Applied Equipment* used the term "stranger to a contract" "interchangeably with the terms 'noncontracting parties' . . . and 'third parties.'" (*Id.* at p. 353.) *Applied Equipment* never "considered the potential liability of noncontracting parties who had some general economic interest or other stake

14

in the contract." (*Id.* at p. 352.) No published California case has disagreed with *Woods* or expanded the scope of *Applied Equipment*.**7**

We also decline to extend the holding of *Applied Equipment.* The evidence shows that Yamaha was the distributor and that Yamaha would supply new motor vehicles to any successor dealer at prices and terms determined by Yamaha and the dealer. There is no evidence that Yamaha had any right to determine the vehicles sent to the dealer, approve or disapprove any business practice of the dealer, assume any financial obligations to the dealer, or otherwise review any part of the dealer's operations. Nor did Yamaha have any rights to determine the terms or conditions of the Powerhouse/MDK contract apart from approval of the sale and review of MDK's financial stability as a Yamaha dealer.

*No Error in Award of Compensatory Damages*

Yamaha contends that a portion of the compensatory damage award included a loss Powerhouse did not incur. Yamaha argues that the damages awarded were based on the full amount Powerhouse would have received under its agreement with MDK, but that there was no evidence that Powerhouse made any effort to mitigate its damages by selling its inventory after the MDK sale was aborted.

We agree with Yamaha that a plaintiff cannot be compensated for damages that were not incurred or could have been mitigated by reasonable effort or expenditures. (*Lu v. Grewal* (2005) 130 Cal.App.4th 841, 849-850.) Whether a plaintiff acted reasonably to mitigate damages, however, is a factual matter to be determined by the trier of fact, and is reviewed under the substantial evidence test. (*Green v. Smith* (1968) 261 Cal.App.2d 392, 397.) The burden of proving a plaintiff failed to mitigate damages,

---

**7** We acknowledge that a federal district court case dealing with facts similar to the instant case supports Yamaha's position to some extent. In *Fresno Motors, LLC v. Mercedes-Benz USA, LLC* (E.D. Cal. 2012) 852 F.Supp.2d 1280, a new car dealer sued Mercedes Benz for tortious interference with the dealer's contractual relationship with a prospective purchaser of the dealership. We conclude that *Fresno Motors* is inapposite and relies, not on California precedent, but rather a Ninth Circuit case that did not rely on or cite *Applied Equipment* and did not concern the immunity of a noncontractual party from a claim of intentional interference with contract relations. (*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.* (9th Cir. 2001) 271 F.3d 825, 832-834.)

however, is on the defendant, not the other way around. (*Lu, supra,* at pp. 849-850; *Millikan v. American Spectrum Real Estate Services California, Inc.* (2004) 117 Cal.App.4th 1094, 1105; *Jackson v. Yarbray* (2009) 179 Cal.App.4th 75, 97.)

Yamaha's argument that Powerhouse failed to mitigate damages ignores its burden of proof and the standard for review. The jury was properly instructed on Powerhouse's duty to mitigate its damages. Yamaha fails to demonstrate that in awarding compensatory damages the jury did not take into account the efforts of Powerhouse to mitigate damages.

### *No Error in Award of Punitive Damages*

Yamaha contends that the $200,000 award of punitive damages to Powerhouse and Pilg was improper because punitive damages cannot be recovered for breach of contract, and because there is insufficient evidence to support the award. We disagree.

Civil Code section 3294, subdivision (a) permits an award of punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Civil Code section 3294, subdivision (b), provides that a corporate employer is not liable for punitive damages based upon the acts of its employees unless the acts were committed, authorized, or ratified by a corporate officer, director, or managing agent.

As with compensatory damages, we review an award of punitive damages under the substantial evidence test. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 545; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916.) We consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference, and resolve evidentiary conflicts in support of the judgment. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.)

Yamaha argues that the punitive damage award was derived from Yamaha's conduct which was expressly permitted by the Franchise Agreement and section 3060.

16

We have previously addressed that issue at length and further note that Powerhouse's intentional interference and section 11713.3 claims are based on tort liability.

Yamaha also argues that the punitive damage award fails because there is no substantial evidence permitting the jury to find that Rocky Aiello, Yamaha regional manager, was a "managing agent" of Yamaha. Again, we disagree.

The term "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566–567.) "[T]o demonstrate that an employee is a true managing agent . . . , a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.) But, the determination of whether certain employees are managing agents "'. . . does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions . . . .'" (*Kelly–Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421.)

Here, there was substantial evidence for a reasonable jury to conclude that Rocky Aiello was a "managing agent" of Yamaha for purposes of an award of punitive damages. The evidence established that Aiello was the "Regional Sales Manager for the Western Region" which included California and three other states. His region included between 140 and 240 dealerships. He managed a group of "district managers" and, as he testified, was "ultimately responsible for the total well-being of Yamaha Motor Corporation Dealers." Further, evidence shows that Aiello was directly involved in the Powerhouse/MDK sale and was responsible for the decision to terminate the dealership.

*No Error in Award of Attorney Fees*

The trial court awarded Powerhouse attorney fees under section 11726 in the total amount of $533,350. Yamaha contends attorney fees were not recoverable because there is no evidence supporting a jury finding that Yamaha willfully failed to comply with the Vehicle Code as required by section 11726. We disagree.

17

Section 11726 provides that "[a]ny licensee suffering pecuniary loss because of any willful failure by any other licensee to comply with" various provisions of the Vehicle Code including section 11713.3 "may recover damages and reasonable attorney fees therefor in any court of competent jurisdiction." Yamaha argues that there was no willful violation because it complied with the requirements of section 3060 in seeking to terminate the Franchise Agreement and reasonably believed that its conduct was not wrongful in any manner.

Although there are no published cases regarding an attorney fee award under section 11726, an appeal of an award of attorney fees is generally reviewed under the abuse of discretion standard. (See, e.g., *Moran v. Oso Valley Greenbelt Assn.* (2001) 92 Cal.App.4th 156, 160.) We conclude that an award of attorney fees was authorized by section 11726 and there was no abuse of discretion by the trial court. As the trial court stated, "willful" conduct is defined as "intentional *wrongful* conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results." (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 735, fn. omitted, overruled on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19.) As the trial court further concluded, willfulness was embodied in the jury's finding that Yamaha "intend[ed] to disrupt" performance of the Powerhouse/MDK agreement, and that Yamaha acted with "malice, oppression, or fraud." The evidence in this case supports the conclusion that Yamaha acted willfully with knowledge of its obligations under section 11713.3 and knowledge of the dire financial consequences of its actions.

POWERHOUSE AND PILG CROSS-APPEAL

*No Error in Granting Nonsuit on Pilg's Section 11713.3 Claim*

Pilg contends the trial court erred in granting Yamaha's motion for nonsuit on the fifth cause of action brought by Pilg for violation of section 11713.3. We disagree.

A defendant is entitled to a nonsuit when, as a matter of law, the evidence presented by the plaintiff is insufficient to allow a jury to find in plaintiff's favor.

18

(*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541; see Code Civ. Proc., § 581c.) The trial court must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts and doubts in favor of the plaintiff. (*Saunders*, at p. 1541.) We review the court's ruling de novo, applying the same standard. (*Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 737.)

Section 11713.3, subdivision (d)(1) provides that it is unlawful for a manufacturer or distributor of new motor vehicles to prevent or attempt to prevent "a dealer, or an officer, partner, or stockholder of a dealership" to sell or transfer "a part of the interest of any of them to another person." The statute concerns the sale or transfer of an "interest" in a new motor vehicle dealership and, more specifically, the franchise to sell the vehicles of a particular manufacturer or distributor. Pilg was an officer and shareholder of Powerhouse, but Powerhouse owned the dealership and the Yamaha franchise. Pilg was not transferring any interest in the dealership or franchise, and the claims against Yamaha concerned Yamaha's interference in the sale of the Powerhouse franchise, not Pilg's interest as an officer and shareholder of Powerhouse.

The Powerhouse/MDK sale included the leasehold interest of Powerhouse in the building occupied by the Powerhouse dealership and, as owner of the building, Pilg was Powerhouse's lessor. Contrary to Pilg's assertion, his interest in the building did not constitute an "interest" in the Powerhouse dealership which was being sold to MDK. Pilg may have suffered economic detriment from Yamaha's action but the intent of section 11713.3 is to protect new motor vehicle dealers against overreaching by manufacturers and distributors. It does not encompass every type of economic detriment.

Because we affirm the trial court's granting of nonsuit, we do not address the proper jury instruction regarding the causation element of Pilg's claim.

*No Error Regarding Award of Attorney Fees*

The trial court awarded attorney fees to Powerhouse under section 11726 for violation of section 11713.3, but denied attorney fees incurred in the protest proceeding before the Board and in bringing a writ of mandate to overturn the Board's

19

ruling. Powerhouse contends the trial court erred by not awarding fees for the Board proceeding. We disagree.

As previously stated, section 11726 permits recovery of attorney fees because of a "willful failure" by a licensee to comply with provisions of the Vehicle Code or any "decision rendered by the board." Here, the record shows that Yamaha fully complied with the statutory requirements of section 3060 regarding its notice of termination, including giving the required notice of Powerhouse's right to file a protest. Powerhouse did not file a protest within the statutory period. Powerhouse did not suffer a loss due to the willful failure of Yamaha to comply with section 3060 or any decision by the Board. Moreover, a licensee is entitled only to reasonable attorney fees under section 11726. The trial court awarded attorney fees and there is no basis in the record to conclude the amount was not reasonable, or that the court abused its discretion.

The judgment is affirmed in all respects. Powerhouse is awarded costs on appeal.

CERTIFIED FOR PUBLICATION.


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.


20

Martin J. Tangeman, Judge

Superior Court County of San Luis Obispo

_____

Baker & Hostetler, Maurice Sanchez; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Marjorie Ehrich Lewis, Blaine H. Evanson, Bradley J. Hamburger for Appellant Yamaha Motor Corporation, U.S.A.

Diane M. Matsinger; Andre, Morris & Buttery, Dennis D. Law, Collette A. Hillier for Appellants Powerhouse Motorsports Group, Inc., and Jerry Namba, as bankruptcy trustee, successor in interest to Timothy L. Pilg.