Filed 7/14/14  530 Hewitt Subsidiary v. P.G.C.A. Holdings CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 530 HEWITT SUBSIDIARY, LLC, Plaintiff and Respondent, v. P.G.C.A. HOLDINGS, INC. et al., Defendants and Appellants. | B249812 (Los Angeles County Super. Ct. No. BC432695) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kevin C. Brazile, Judge.  Affirmed.

The Linde Law Firm, Douglas A. Linde, Erica A. Gonzales and Benjamin R. Fliegel, for Defendants and Appellants.

Greenberg Glusker Fields Claman & Machtinger, Matthew N. Falley and Caroline S. Heindel, for Plaintiff and Respondent.

_____

Defendants and appellants Primo Hospitality Group, Inc., Anthony Riviera, and Charlton Lui (collectively "Primo") challenge a trial court judgment issued against them in a commercial lease dispute. Primo, as tenant, entered into a commercial lease with plaintiff and respondent 530 Hewitt Subsidiary, LLC (530 Hewitt), for a space intended to be used as a restaurant. Primo contends the trial court erred in concluding it materially breached the lease, since 530 Hewitt did not provide it with a notice of default or opportunity to cure the particular breaches the court found material. Primo also asserts the court erred in finding any of the alleged breaches material, in calculating the award of damages, and in awarding attorney fees to 530 Hewitt as the prevailing party. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts in accordance with the usual rules on appeal. Specifically, we review the record in the light most favorable to the judgment and resolve all evidentiary conflicts in favor of the prevailing party. (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 744.)

In December 2007, 530 Hewitt and Primo entered into a commercial retail lease for a property near downtown Los Angeles. Primo agreed to use the property to operate a full-service restaurant and gourmet market ("Primo Cucina" or "the project") within a larger commercial and residential development, for a 10-year term. The parties agreed there would be a one-year period of construction, or "build out", of the leased property. 530 Hewitt anticipated the restaurant would open in January 2009.

Under the lease, Primo and 530 Hewitt were to share the costs of "tenant improvements" required to build out the space. Primo was to deposit $250,000 in a joint bank account with 530 Hewitt. Primo was to use the $250,000 solely to pay for the costs of "designing and constructing the Tenant Improvement Work." After exhausting these funds, Primo was entitled to receive a $406,800 construction allowance from 530 Hewitt, in two disbursements. 530 Hewitt had "no obligation to disperse any portion of the Construction Allowance until all of the funds in the account have been expended by Tenant for the design and construction of the Tenant Improvement Work and Tenant has

2

provided Landlord with reasonable evidence of the application of all those funds for that purpose." A "base rent" of $13,560 per month was abated for the first 24 months of the lease term following the "rent commencement date."[1] For months 25 to 60, Primo agreed to pay a monthly base rent of $13,560, to increase to $16,950 from month 61 to the end of the initial lease term.

To begin construction, the project required a conditional use permit, and a permit from the city's building and safety department. The city issued an amended conditional use permit in January 2009. The building and safety permit was issued in March 2009. At the end of January 2009, Primo informed 530 Hewitt it had spent the $250,000 deposited in the joint account, and it requested the first portion of the construction allowance. 530 Hewitt asked Primo to provide documentation reflecting its expenditures. After Primo forwarded various invoices and copies of checks, 530 Hewitt released the first $203,000 of the construction allowance.

In April 2009, soon after 530 Hewitt disbursed the construction allowance, Primo sent 530 Hewitt a letter demanding it comply with the terms of the lease. Primo asserted 530 Hewitt was required to construct all walls within the property, while 530 Hewitt had taken the position that it was only required to build certain perimeter walls, not interior walls. As a result of this dispute, the parties began discussing an amendment to the lease.

In August 2009, 530 Hewitt installed a required grease trap.[2] Around that time, 530 Hewitt's project manager began asking Primo for "milestone dates" that could be

---

[1] The lease defines "commencement date" as "the date that is the later of a) January 15, 2008, or b) the date upon which Landlord delivers the Premises to Tenant in its 'AS IS' condition after the full execution and delivery of this Lease." The "rent commencement date" is defined as "the date that is one (1) year (the 'Construction Period') after of [*sic*] the Commencement Date. The Construction Period shall be extended by one (1) day for each day that substantial completion of Tenant's Work is actually delayed by Landlord Delays."

[2] At trial, 530 Hewitt's project manager explained a grease trap as follows: "[I]n the city of L.A., you're not allowed to put grease down into the main sewer line. . . . So when you build out a restaurant, all of the sewer lines that come from the kitchen, they have to

3

inserted into an amendment to the lease. By mid-September 2009, Primo had completed only a portion of the necessary underground plumbing work on the premises, it had not provided the requested milestone dates or a construction schedule, and the parties had not signed a lease amendment. Primo had told its plumber to stop work. 530 Hewitt wanted Primo to complete the underground plumbing work before it connected the grease trap to the sewer line, installed a methane barrier, and put in the "slab on grade."[3] Although some portions of required work were independent of each other, 530 Hewitt could not put in the slab on grade until the underground plumbing was finished. The underground plumbing work could be completed before the grease trap was connected to the sewer line.

In October 2009, 530 Hewitt sent Primo a letter asserting Primo was in breach of its obligations under the lease, including by its failure to continuously use the property as a café during the first full year after the rent commencement date, and by its abandonment of the premises. The letter explained: "In an attempt to accommodate Tenant, on July 27, Landlord's representative emailed Mr. Rivera with an outline of a proposed amendment to the Lease that would have, among other things, extended the Rent Commencement Date until January 15, 2010. In this correspondence . . . Landlord requested the schedule of construction of the Tenant Improvements, including certain milestone dates, but Tenant has failed to respond to all such communication from landlord. As a result, the Rent Commencement Date occurred on January 15, 2009. Despite the minimal underground plumbing work performed by Tenant on the Premises on or around August 2009, as of today, no work is being performed by Tenant at the Premises and Tenant continues to be in default under the Lease for failure to timely open and operate its business in the Premises." The letter indicated that if Primo did not

go to this – basically it's a large box that goes underground, and that box essentially filters the grease out and then sends clean sewer into the sewer line."

[3] 530 Hewitt eventually connected the grease trap to the sewer line in 2011. The project manager described "slab on grade" as "actually the concrete slab that you step on. That's the floor basically."

4

provide a tenant improvement work schedule with milestone dates within 30 days, 530 Hewitt would pursue its remedies under the lease.

In November 2009, Primo denied it was in default under the lease. In correspondence with 530 Hewitt, Primo asserted it had completed its underground plumbing work and could not move forward with construction because 530 Hewitt had not paid the plumber to perform the sewer connection. Primo further contended the sewer work had to be completed before it could proceed.

In February 2010, 530 Hewitt filed suit against Primo, asserting claims for breach of contract and breach of written guaranty. 530 Hewitt alleged Primo had breached the lease by failing to complete construction on the property, or to return the construction allowance; by failing to open or operate a restaurant on the premises; by abandoning the premises; by failing to make any rent payments; and by "repudiating its obligation to comply with these and other provisions of the lease." 530 Hewitt sought over $3 million in damages. Primo cross-complained against 530 Hewitt and related entities.

Through pre-trial discovery 530 Hewitt uncovered discrepancies between the supporting documentation Primo submitted to it in February 2009 to support the request for the construction allowance and copies of the same documentation from other sources. For example, Primo had submitted copies of checks to 530 Hewitt with no information written on the memo line. However, when 530 Hewitt secured copies of the same checks from the bank through third-party discovery, some had notations on the memo lines suggesting the expenditures were for Primo's other projects, not Primo Cucina.

530 Hewitt amended its complaint to allege fraud. It also included the failure to use the $250,000 in "tenant funds" solely for the design and construction of Primo Cucina as an additional basis for the breach of contract claim. Primo eventually admitted some of the documentation it gave 530 Hewitt in February 2009 was for expenditures on other projects, or was otherwise inaccurate or misleading. However, Primo maintained it spent well over $250,000 on Primo Cucina, even though some of the funds may have come from different bank accounts. Primo claimed it submitted erroneous documentation to 530 Hewitt due to careless accounting and recordkeeping.

5

At a bench trial in November 2012, 530 Hewitt's project manager testified that it had been unable to find a new tenant for the property. Although one group was interested in the property in the spring of 2011, the group did not lease the space because of concerns about the litigation with Primo, including Primo's demand for specific performance of the lease.

Following the trial, the court issued a written tentative.[4] In the tentative, the trial court concluded Primo materially breached the lease when it failed to spend the allotted $250,000 on tenant improvements, as required in the lease, before the disbursement of the first portion of 530 Hewitt's construction allowance. The court found Primo's failure to deliver a construction schedule was not a material breach of the lease because it did not significantly excuse or affect 530 Hewitt's performance. The court also concluded Primo neither abandoned the design and construction of the restaurant, nor breached the lease by failing to open the restaurant because it was prevented from doing so by 530 Hewitt's delay in connecting the sewer line and in constructing the interior walls. The court concluded 530 Hewitt did not materially breach the lease, and was thus entitled to damages. It deemed the lease terminated effective November 6, 2009, 30 days after 530 Hewitt's default letter to Primo. The court awarded 530 Hewitt $691,560 in damages; this number reflected monthly base rent from November 6, 2009 to the date the court took the case under submission (February 8, 2013), plus one year of additional rent "in order to mitigate damages." The court rejected all other damage claims and Primo's cross-claims. It found Primo had not engaged in fraud.

---

[4]     Before the trial began, the court informed the parties: "[I]f you want a statement of decision, the way I generally do it is this. Once I issue a decision, I issue a tentative. I'll give you a written tentative. And then if somebody wants a statement of decision, I'll designate the prevailing party to prepare it. Usually my tentative will give you pretty much everything you need to put in the statement of decision, but I'll designate one of you to –whoever wins is going to be designated to do it on the rules of court." No party in this case requested a statement of decision.

Primo filed objections to the tentative. Primo asserted its failure to spend the $250,000 on tenant improvements to Primo Cucina could not be a breach because 530 Hewitt had never provided a notice of such default or opportunity to cure, as required under the lease. Primo also challenged the trial court's calculation of damages. In response, 530 Hewitt argued Primo's objections were untimely and procedurally improper; 530 Hewitt could not have provided Primo with notice of the breach and opportunity to cure because it did not discover the $250,000-related breach until litigation and discovery were underway; notice was unnecessary in any event because Primo could not cure the breach; and substantial evidence supported the award of damages. The trial court overruled Primo's objections and issued a final judgment. Primo timely appealed.

## DISCUSSION

### I. The Trial Court Did Not Err in Finding a Material Breach with Respect to the $250,000 in Tenant Improvement Funds

Primo contends the trial court erred in finding it materially breached the lease in connection with the $250,000 in tenant improvement funds. Primo asserts that under the terms of the lease, there could be no tenant default unless 530 Hewitt gave notice of the breach and 30 days to cure. Primo contends there was no evidence 530 Hewitt provided such notice with respect to Primo's failure to spend $250,000 from the joint account on tenant improvements for the property. We find no error.

#### A. The Trial Court Did Not Issue a Statement of Decision

Initially, we note there was no statement of decision issued in this case. The parties have essentially treated the written tentative as if it were a statement of decision, but the court did not indicate the tentative was a proposed statement of decision, or that it would become the statement of decision in the absence of a request for a statement of decision.[5] In general, a tentative order is not a substitute for a statement of decision.

---

[5] Under California Rules of Court, rule 3.1590, subdivision (c)(1), the court in a tentative decision may state that the tentative is the court's proposed statement of decision, subject to a party's objection under subdivision (g). Under subdivision (c)(4), the court may "[d]irect that the tentative decision will become the statement of decision

7

(*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268 (*Shaw*).) Further, in the absence of a statement of decision, "an appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Id.* at p. 267.)

Accordingly, while a tentative "may be valuable in illustrating the trial judge's theory," it will not "be used to impeach the order or judgment on appeal. [Citation.] This is because a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment and then the judgment supersedes any memorandum or tentative decision or any oral comments from the bench. [Citations.] . . . . In the absence of a statement of decision, a reviewing court looks only to the judgment to determine error. [Citation.] Absent contrary indication in the final judgment or statement of decision, the appellate court will assume that, during the period before rendition of judgment, the trial court realized any error and corrected it." (*Shaw, supra,* at p. 268.)

Here, there was no statement of decision, but the trial court signed a judgment that attached the tentative and incorporated it by reference, without expressly adopting the tentative or its reasoning as a final order or statement of decision. Although we will use the court's tentative factual findings and conclusions of law as a guide in our review of the judgment, we will not construe the tentative so as to impeach the judgment. "A failure to request a statement of decision results in a waiver of findings and conclusions necessary to support the judgment and we will accordingly infer such conclusions. [¶] Moreover, we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. [Citation.] There can be no prejudicial error

---

unless, within 10 days after announcement or service of the tentative decision, a party specifies those principal controverted issues as to which the party is requesting a statement of decision or makes proposals not included in the tentative decision."

from erroneous logic or reasoning if the decision itself is correct." (*Shaw, supra,* 170 Cal.App.4th at p. 269.)

**B. Substantial Evidence Supported a Finding that 530 Hewitt Provided Notice as Required By the Lease**

Primo asserts the trial court erred in identifying the following as breaches: "All of the $250,000 deposited in the Joint Bank Account was not used for the [Primo Cucina] restaurant" and "All tenant improvements made to the [Primo Cucina] restaurant were not paid from Joint Bank Account."[6] Primo contends this was error because the lease required 530 Hewitt to provide notice of any alleged breach and an opportunity to cure, and there was no evidence that it provided such notice with respect to the $250,000-related breaches. We disagree. First, we reject Primo's characterization of the breaches relating to the $250,000 as nothing more than accounting failures that merely caused it to spend money out of the wrong bank account. Substantial evidence supported a far more broad interpretation of the breach regarding the tenant improvement expenditures. Second, we conclude substantial evidence supported the trial court's implied finding that the October 2009 letter provided sufficient notice of this breach.

*Defaults Under the Lease and Notice*

Section 21.1 of the lease defines tenant defaults, in relevant part, as follows: "The occurrence of any of the following shall constitute a 'Tenant Default' hereunder . . . Tenant fails to perform any other obligation or observe any other provision hereunder within thirty (30) days following written notice, or any material breach of a representation or warranty of Tenant herein remains uncured on the thirtieth (30th) day following written notice; provided that, if such default is curable but cure cannot reasonably be effected within such thirty (30) day period, such default shall not be

---

**6**     Primo also contends the trial court erred in concluding Primo's failure to deliver a construction schedule was a breach, albeit an immaterial one. We need not consider this issue in light of our conclusion that substantial evidence supported a trial court finding that Primo's failure with respect to the $250,000 in tenant improvements was a material breach, of which 530 Hewitt provided sufficient notice under the lease.

a Tenant Default so long as Tenant promptly commences cure (in any event, within such thirty (30) day period) and thereafter diligently prosecutes such cure to completion[.]" Section 21.2 of the lease provides that upon the occurrence of a tenant default, the landlord has the right to pursue one or more identified remedies, including, but not limited to, terminating the lease by written notice, taking possession of the premises, removing the tenant, and recovering damages from the tenant; or continuing the lease and pursing other rights and remedies permitted by law.

We thus agree that, in general, the lease required notice and a period to cure before the tenant could be deemed to have defaulted under the terms of the lease. (See *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 312-313 [where agreement indicated a party would be in breach *only* upon failure to perform obligation after receipt of notice, there could be no breach if notice was not provided].) The court concluded Primo's failure to comply with the parties' agreement with respect to tenant improvements and the use of the "tenant funds," was a material breach of the lease. We imply that the trial court also found there was sufficient notice of this breach under the lease. This conclusion was supported by substantial evidence.

*The Breach in this Case and Notice of Defaults*

Although at trial much of the parties' evidence of the dispute regarding the tenant funds related to the documentation of expenditures, the trial court could properly understand the $250,000 breach as first, Primo's failure to make an agreed-upon investment in the project, and second, Primo's failure to make agreed-upon progress in the project, as measured by $250,000 worth of work on the property. The breach involving the $250,000 was multi-faceted. The failure to spend $250,000 out of the joint account on tenant improvements for the Primo Cucina project was a problem because it was an indication that Primo was not, in fact, pursuing the project as the parties had agreed. As the court concluded, Primo may have spent the money, but it was not all spent on designing or constructing Primo Cucina.

10

The evidence supported a conclusion that this aspect of the breach was encompassed in the October 2009 letter alleging Primo had defaulted under the lease. The letter specifically noted Primo's failure to open and operate a restaurant, and it alleged Primo had abandoned the property. But the letter also asserted Primo failed to provide requested milestone dates for construction, and complained of Primo's failure to perform any work at the premises since August 2009. Although the letter did not explicitly reference the $250,000, it provided notice that 530 Hewitt was claiming Primo was in breach of the lease by not making significant progress on the project, progress the $250,000 and construction allowance were intended to fund and facilitate.

Thus, we understand the trial court's analysis that Primo "breached the lease agreement because all of the tenant improvements were not paid from the East West bank account," "Primo admitted some of the $250,000 in the East West bank account was not spent on the Tenant Improvements," "Primo used the East West bank account to fund expenditures on other Primo restaurants," and "Primo further breached the lease agreement because all of the $250,000 deposited into the East West Bank account by Primo was not expended on Tenant Improvements prior to the release of 50% of the Construction Allowance by Hewitt to Primo," as findings regarding Primo's failure to make agreed-upon improvements to the property within the time frames contemplated by the lease. As such, the court could also conclude this breach was adequately raised in the October 2009 notice of default.

The cases Primo relies upon to support its argument do not mandate a different result because they concern the three-day statutory notice to quit required before a landlord may proceed with an unlawful detainer action and recover possession of a property. (See e.g., *Julien v. Gossner* (1951) 103 Cal.App.2d 338, 344 [default had to be specifically identified for it to form basis of notice to quit under Code Civ. Proc. § 1161 (2); "The evident purpose of that section is to specifically point out breaches complained of in order that they may be remedied within the time allowed by the statute."]; *Horton-Howard v. Payton* (1919) 44 Cal.App.108.) The summary remedy of unlawful detainer requires strict compliance with Code of Civil Procedure section 1161, which sets forth

11

specific requirements for a notice to quit. (*Culver Center Partners East #1, L.P. v. Baja Fresh Westlake Village, Inc.* (2010) 185 Cal.App.4th 744, 749-750.) However, "[i]n commercial leases the landlord and commercial tenant may lawfully agree to notice procedures that differ from those provided in the statutory provisions governing unlawful detainer." (*Id.* at p. 750.)

This was not an unlawful detainer case. 530 Hewitt did not pursue a summary remedy to recover possession of the property. Code of Civil Procedure section 1161, the legal basis for the analysis in the cases Primo relies upon, did not govern whether 530 Hewitt's notice of default was sufficient to meet the requirements of the parties' lease. Although the lease contemplates the tenant may be in default after receiving "written notice" from the landlord, it does not set forth any specific requirements for that notice. In any event, 530 Hewitt's October 2009 letter to Primo clearly and unambiguously asserted Primo had breached its obligations under the lease by failing to perform work on the project.

*Materiality*

Substantial evidence also supported a trial court finding that this breach was material. "Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact. . . . Whether a partial breach of a contract is material depends on 'the importance or seriousness thereof and the probability of the injured party getting substantial performance.' [Citations.] 'A material breach of one aspect of a contract generally constitutes a material breach of the whole contract.' [Citation.]" (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277-278.) In this case there was evidence that Primo had not used the $250,000 to make contemplated tenant improvements on the property, and instead had diverted some of the funds to other uses unrelated to Primo Cucina. In fact, there was substantial evidence that aside from incomplete underground plumbing, Primo engaged in no other construction work on the premises, nearly two years after it took possession of the property, and at least six months after a building and safety permit was issued. The court could reasonably construe the lack of spending on building out the property as

12

evidence of a material breach of the contract, because it was merely a proxy for the lack of actual work or progress on the project as a whole.

Primo asserts a breach of the lease provision regarding the $250,000 was not a material breach because that lease term has no bearing on "what or how improvements will be made and does not affect [Primo's] obligation to pay rent." While the term regarding the tenant improvement funds did not explicitly concern how tenant improvements would be made, it was integrally related to Primo's obligation to actually build out the premises. Further, contrary to Primo's argument on appeal, the benefit 530 Hewitt sought to receive from the lease was not limited to rent payments. 530 Hewitt also wanted an operational restaurant and gourmet market to fit into its larger development, and to service residents and other customers at neighboring or adjacent properties. Accordingly, in addition to obligating Primo to pay rent, the lease required that Primo use the leased premises "in a manner consistent with a first-class street level retail area in a project that contains residential uses . . . ." The lease required Primo to be open during certain hours, and allowed for penalties should it fail to do so for specified minimum periods. Similarly, the lease required Primo to "at all times employ its best skills, efforts and abilities to operate the Permitted Use in the Premises in order to produce the highest possible Gross Sales, and to enhance the customer traffic in, and reputation and attractiveness of, the Project."[7] The failure to spend the $250,000 on tenant improvements frustrated that purpose, and justified 530 Hewitt's belief that Primo's performance was unlikely. (*Asso. Lathing Etc. Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 49-51 [partial breach prior to or at outset of performance may be a material breach; injured party not required to speculate about breaching party's future performance where breaching party has already indicated it intends to delay, hedge, and refuse to cooperate, even absent repudiation].)

---

[7] The project was defined in the lease as the entire development, of which Primo Cucina was to be only one part.

13

Substantial evidence also supported a trial court finding that 530 Hewitt did not materially breach the lease.  There was evidence that Primo had not completed the underground plumbing which was necessary for other work to proceed, including work 530 Hewitt was obligated to perform.  Further, there was evidence that although 530 Hewitt had not connected the grease trap to the sewer line, the connection was not necessary for Primo to finish the underground plumbing.  Similarly, there was evidence that even if 530 Hewitt was responsible under the lease for building interior walls, the time for its performance never came because of Primo's failure to move forward with other aspects of the construction.  There was evidence that interior walls could not be constructed until the slab on grade was completed, and the slab could not be put in until all of the underground plumbing was finished.  Substantial evidence supported the trial court's finding that 530 Hewitt did not materially breach the lease.

## II.     The Trial Court Did Not Err in Calculating Damages

Primo contends the trial court's award of damages was improper because there was insufficient evidence of mitigation.  Primo further asserts the trial court incorrectly assessed damages as if Primo abandoned the property, and the damages were excessive and unreasonable.  We find no error.

### A.  Sufficient Evidence of Mitigation

"It is settled that a lessor, injured by breach of a contract must mitigate his damages.  [Citation.]  However, the burden is on the lessee to prove that the lessor failed to mitigate.  [Citations.]" (*Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 433.)  Here there was evidence that 530 Hewitt attempted to re-lease the property.  It retained a large real estate brokerage firm, came close to securing a deal with a new tenant, and even offered to indemnify a new potential tenant to overcome its hesitation due to the ongoing litigation with Primo.  Primo did not offer any contrary evidence showing 530 Hewitt failed to mitigate.  The evidence was sufficient to show 530 Hewitt engaged in reasonable efforts to mitigate its damages. (*Millikan v. American Spectrum Real Estate Services Cal., Inc.* (2004) 117 Cal.App.4th 1094, 1101-1102.)

**B. No Error in Calculation of the Award**

We likewise find no error in the trial court's calculation of the award. The purpose of a damage award in a contract case is to put the prevailing party " 'in as good a position as [it] would have been had performance been rendered as promised.' [Citation.] Because this goal can never be exactly attained, the rules governing recovery of contract damages are flexible and ' "leav[e] much to the individual feeling of the court created by the special circumstances of the particular case." [Citation.]' [Citation.] Damages cannot be calculated with absolute certainty, and California law 'requires only that some reasonable basis of computation . . . be used, and the damages may be computed even if the result reached is an approximation.' [Citation.]" (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 570.) "The selection of which measure of damages to apply is within the sound discretion of the trier of fact." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 874.) The trial court's measure of damages in this case was reasonable.

The court deemed the lease terminated as of November 2009, 30 days after 530 Hewitt notified Primo of the alleged breaches of the lease. The court awarded 530 Hewitt lost rent from that "termination" date until the date the case was submitted. This was consistent with the parties' lease, which allowed that in the event of a tenant default, the landlord would have the right to terminate the lease and recover "[t]he worth at the time of the award of the amount by which the unpaid rent which would have been earned following termination and until the time of the award exceeds the amount of such rental loss that Tenant proves could reasonably have been avoided."[8] In addition, the trial court allowed for one year of future rent, which was consistent with a lease provision allowing the landlord "the worth at the time of the award of the amount by which the unpaid rent

---

[8] Although the parties agreed rent would be abated for the first 24 months after the "rent commencement date," section 27.23 of the lease also provides that in the event the tenant's right of possession is terminated due to a default, certain amounts would immediately be payable to the landlord, including the value of any abated rent.

for the balance of the term after the time of the award exceeds the amount of such rental loss that Tenant proves could reasonably have been avoided."

These measures of damages were also consistent with general contract principles, which indicate contract damages should seek to restore the prevailing party to the position it would have been in had the breach not occurred. (See Civ. Code, § 3300; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.) Due to Primo's breach of the lease in its failure to make at least $250,000 worth of tenant improvements, the project had not moved forward, there was no operational restaurant, 530 Hewitt had not received rent, and it had been unable to lease the property to another tenant. Using the monthly base rent as a guide, awarding damages from the "termination" date to the case submission date, and allowing one year of additional rent, was reasonable under the circumstances. Primo has failed to establish any reversible error in the trial court's award of damages.

In light of our decision affirming the trial court judgment, we reject Primo's contention that the court erred in awarding attorney fees to 530 Hewitt as the prevailing party.

## DISPOSITION

The trial court judgment is affirmed. Respondent shall recover its costs on appeal.


BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.

16