Filed 2/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SUBARU OF AMERICA, INC.,<br>    Plaintiff and Respondent,<br>v.<br>PUTNAM AUTOMOTIVE, INC.,<br>    Defendant and Appellant, | A159686<br><br>(San Francisco County Super. Ct.<br> No. CPF-18-516093) |

Putnam Automotive Inc., doing business as Putnam Subaru (Putnam), a Subaru dealer, appeals from the trial court's judgment confirming an arbitration award in favor of Subaru of America, Inc. (Subaru), a new motor vehicle distributor. In his final award, the arbitrator found that Subaru had good cause for terminating an agreement with Putnam to operate a satellite service-only facility in San Francisco. On appeal, Putnam contends the judgment should be reversed and the arbitrator's final award vacated because (1) the arbitrator lacked jurisdiction to make a good cause determination under both federal and state law; (2) enforcement of the arbitration provision in the agreement was illegal under the Vehicle Code; (3) the public policy underlying California's New Motor Vehicle Board Act precluded the arbitrator from making a good cause determination; (4) the arbitrator's award cannot be corrected without affecting the merits of the decision; and (5) Putnam's due process rights were violated when Subaru failed to

1

provide it with the required notice of the reasons for terminating the agreement.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2008, after Putnam purchased a service-only Subaru facility (Satellite Service Facility) in downtown San Francisco from a former Subaru dealer, Subaru and Putnam entered into a temporary Subaru "Dealer Candidate Satellite Service Facility Agreement," which permitted Putnam to provide Subaru warranty repairs at the Satellite Service Facility, pending Subaru's approval of Putnam's application to establish an authorized Subaru dealership at a proposed location in Burlingame.  Putnam operated the Satellite Service Facility under the temporary agreement until issues related to the establishment of the Burlingame dealership were resolved in March 2009.

On March 25, 2009, Subaru and Putnam entered into a "Subaru Dealer and Standard Provisions Agreement" (Burlingame Dealer Agreement) for the sale and service of motor vehicles at the Burlingame dealership, as well as the operative Subaru Dealer Satellite Service Facility Agreement (Satellite Service Agreement) for service operations only at the Satellite Service Facility in San Francisco.

The Satellite Service Agreement, which was operative for an initial term of five years, contained an arbitration provision, which stated:  "The parties agree that the enforcement, interpretation or any disputes arising out of this Agreement shall be exclusively resolved through arbitration in Camden County, New Jersey, conducted under the Commercial Arbitration Rules of the American Arbitration Association and shall be governed by the laws of the State of New Jersey."  (Satellite Service Agreement, § 10.6.)

In a September 23, 2013 letter, Subaru informed Putnam that it was exercising its right to extend the 2009 Satellite Service Agreement for another five-year period, beginning on March 25, 2014, with "[a]ll provisions of that Agreement remain[ing] in full force and effect."

Thereafter, Putnam attempted to engage with Subaru regarding relocating the Satellite Service Facility, but in a November 6, 2017 letter to Putnam, Subaru stated that it would not approve Putnam's proposed relocation of the Satellite Service Facility and would not renew the Satellite Service Agreement when it expired in 2019.

On November 13, 2017, Putnam filed two administrative protests with the New Motor Vehicle Board (Board)—a termination protest under Vehicle Code section 3060, subdivision (a)[1] and a modification protest under section 3060, subdivision (b)—arguing that Subaru did not have good cause for refusing to approve the proposed relocation of the Satellite Service Facility and terminating Putnam's right to continue to operate that facility upon expiration of the Satellite Service Agreement.

On March 14, 2018, Subaru filed a petition to compel arbitration of Putnam's claims, pursuant to the arbitration provision in the Satellite Service Agreement.

On June 22, 2018, the trial court entered an order granting the petition to compel arbitration in part and denying it in part. The court first found that the Satellite Service Agreement did not come within the Motor Vehicle Franchise Contract Arbitration Fairness Act (Fairness Act) (15 U.S.C. § 1226), a narrow exception to the Federal

---

[1] All statutory references are to the Vehicle Code unless otherwise indicated.

Arbitration Act (FAA) (9 U.S.C. § 1 et seq.), and Putnam was therefore compelled to arbitrate its claims arising from that agreement. The court, however, denied Subaru's request to compel Putnam to dismiss its Board protests because discontinuing the Satellite Service Agreement might be found to modify the Burlingame Dealer Agreement, an agreement that *would* come within the Fairness Act's exception to arbitration. The court encouraged the parties to agree to stay either the arbitration or the Board proceedings, and the parties ultimately agreed to stay the Board protests pending completion of the arbitration proceedings.

On April 25, 2019, following a preliminary arbitration proceeding on choice of law, the arbitrator found that the Satellite Service Agreement was a franchise under section 331, that California law applied to the dispute, and that Subaru would be required to show good cause for termination of the agreement, pursuant to sections 3060 and 3061, in a subsequent arbitration proceeding.

Putnam then unsuccessfully sought summary judgment based on Subaru's alleged failure to provide notice of its reasons for terminating the Satellite Service Agreement, as required under the Vehicle Code.[2]

On October 1, 2019, following the second arbitration proceeding on the question of good cause, the arbitrator issued his final award, in which he found that Subaru had carried its burden to show good cause for terminating the Satellite Service Agreement.

---

[2] At the subsequent good cause hearing, the arbitrator did, however, limit Subaru's good cause argument to the grounds for termination previously communicated to Putnam.

Subaru subsequently filed a petition to confirm the arbitrator's final award, and Putnam filed an opposition and a request for the trial court to vacate the award.

On November 15, 2019, the court entered an order granting Subaru's petition to confirm the arbitration award, and on December 18, the court entered a judgment confirming the award.

On January 8, 2020, Putnam filed a notice of appeal from the judgment confirming the arbitration award and denying Putnam's request to vacate the award.

## DISCUSSION

In *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 6, the California Supreme Court discussed the appropriate standard for judicial review of arbitration awards, explaining that with limited exceptions, "an arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." The merits of the controversy are not subject to judicial review, including the validity of the arbitrator's reasoning and the sufficiency of the evidence supporting the award. (*Id.* at p. 11.) Instead, the grounds for vacating an arbitration award are generally limited to those set forth in Code of Civil Procedure section 1286.2. (*Moncharsh*, at p. 28.)

Here, Putnam states that its challenge to the arbitrator's final award was permissible because its arguments are based on two of the grounds for vacating an arbitration award in Code of Civil Procedure section 1286.2. Specifically, Putnam asserts that the award must be vacated because the arbitrator "exceeded [his] powers and the award cannot be corrected without affecting the merits of the decision upon

5

the controversy submitted" (Code Civ. Proc., § 1286.2, subd. (a)(4)) and because its rights "were substantially prejudiced . . . by other conduct of the arbitrator[] contrary to the provisions of this title." (Code Civ. Proc., § 1286.2, subd. (a)(5).)

Most of Putnam's contentions require interpretation of state and federal statutes. Such questions of statutory interpretation are subject to our independent review. (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 633.) In interpreting a statute, " '[o]ur fundamental task is to determine the Legislature's intent and give effect to the law's purpose. [Citation.] We begin by examining the statute's words " 'because they generally provide the most reliable indicator of legislative intent.' [Citation.] If the statutory language is clear and unambiguous our inquiry ends." ' [Citation.] In that case, the plain meaning of the statute is controlling, and ' "resort to extrinsic sources to determine the Legislature's intent is unnecessary." ' [Citation.]" (*Id.* at pp. 633–634.)

## I. *The Arbitrator's Jurisdiction to Make a Good Cause Determination*

"The United States Supreme Court has recognized that the 'disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some 25 States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers.' [Citation.]" (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.* (2013) 221 Cal.App.4th 867, 877–878, quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.* (1978) 439 U.S. 96, 100–101.)

Putnam first contends the judgment must be reversed and the arbitrator's final award vacated because the arbitrator exceeded his

powers under Code of Civil Procedure section 1286.2, subdivision (a)(4), in that he lacked subject matter jurisdiction to make a good cause determination under both federal and state law relating to agreements between motor vehicle manufacturers or distributors and dealers. (See *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 ["An arbitrator exceeds his powers when he acts without subject matter jurisdiction"]; accord, *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1055 (*O'Flaherty*).) In particular, Putnam claims the arbitrator lacked jurisdiction to make a good cause determination because the Fairness Act (15 U.S.C. § 1226) and California's New Motor Vehicle Board Act (§ 3000 et seq.) applied to the Satellite Service Agreement, as an exception to arbitration.

## A. *Jurisdiction to Arbitrate Under Federal Law*

The federal statute at issue here is the Fairness Act, title 15 of the United States Code section 1226.[3] The Senate Judiciary Committee's Report describing the purpose of the legislation explained: "The Motor Vehicle Franchise Contract Arbitration Fairness Act, S. 1140, is a targeted amendment to the Federal Arbitration Act which requires that whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to the contract, arbitration may be used to settle the controversy only if both parties consent in writing after such controversy arises. This legislation would allow motor vehicle dealers the option of either going to arbitration or utilizing procedures and remedies available under State law such as those involving State-established administrative

---

[3] Title 15 of the United States Code section 1226(a) applies to contracts entered into after November 2, 2002. (15 U.S.C. § 1226(b).)

7

boards specifically created and uniquely equipped to resolve disputes between motor vehicle dealers and manufacturers. This legislation is intended to ensure that motor vehicle dealers are not required to forfeit important rights and remedies afforded by State law as a condition of obtaining or renewing a motor vehicle franchise contract." (Sen.Rep. No. 107-266, 2d sess. (2002).)

Title 15 of the United States Code section 1226(a) provides in relevant part:

"(a) Election of arbitration

"(1) Definitions. For purposes of this subsection—[¶] . . . [¶]

"(B) the term 'motor vehicle franchise contract' means a contract under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles.

"(2) Consent required. Notwithstanding any other provision of law, whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy."

Here, in granting Subaru's petition to compel arbitration, the trial court found that the Satellite Service Agreement did not come within the narrow exception to arbitration provided by the Fairness Act because it did not come within the definition of "motor vehicle franchise contract" in title 15 of the United States Code section 1226(a)(1)(B), i.e.,

"it is not a contract under which motor vehicles are both serviced and sold."

Putnam does not argue that, standing alone, the Satellite Service Agreement falls within the Fairness Act's exception to arbitration, in light of the definition of a motor vehicle franchise contract in title 15 of the United States Code section 1226(a)(1)(B) and the fact that the Satellite Service Agreement is a contract under which Putnam services, but does not sell, motor vehicles. Putnam's claim is that the Satellite Service Agreement "cannot be viewed in isolation" and must be considered in conjunction with the Burlingame Dealer Agreement, under which motor vehicles are both serviced and sold, pursuant to Civil Code section 1642.

Civil Code section 1642 provides: "Several contracts relating to the same matters between the same parties, and made as parts of substantially one transaction, are to be taken together." Even where Civil Code section 1642 applies, however, whether two agreements constitute a single contract depends on the circumstances and intent of the parties: " ' "While it is the rule that several contracts relating to the same matters are to be construed together [citation], it does not follow that for all purposes they constitute one contract." ' [Citation.] The rule is simply a particular application of the more general principle that '[w]e construe [a] contract in light of the circumstances under which it was made . . . . [Citation.]' [Citation.]" (*Fuentes v. TMCSF, Inc.* (2018) 26 Cal.App.5th 541, 548 (*Fuentes*).) Moreover, even if two contracts could be considered one transaction, this fact "is not dispositive. Rather, just as when any issue turns on contractual interpretation, we must look to the mutual intent of the parties. (Civ.

9

Code, § 1636;[4] [citation].) ' "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citations.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.]" (*Fuentes*, at p. 549; accord, *Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 814 ["The parties' intent must, in the first instance, be ascertained objectively from the contract language"].)

According to Putnam, the undisputed evidence in the record demonstrates that the Satellite Service Agreement should be taken together with the Burlingame Dealer Agreement to constitute a single contract "under which a motor vehicle manufacturer . . . or distributor sells motor vehicles to any other person for resale to an ultimate purchaser *and* authorizes such other person to repair and service the manufacturer's motor vehicles," which would satisfy the Fairness Act's narrow exemption from the FAA. (15 U.S.C. § 1226(a)(1)(B), italics added.)

The trial court did not explicitly address whether Civil Code section 1642 or relevant authority related to ascertaining the parties' intent applied to the Satellite Service Agreement and the Burlingame Dealer Agreement, but it's conclusion that the Satellite Service Agreement was not a contract under which vehicles are both serviced and sold makes clear that it did not find that the two agreements should be treated as one. (See, e.g., *City of Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418, 429 [where record is silent as to

---

[4] Civil Code section 1636 provides: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."

trial court's findings on applicability of Civil Code section 1642, "we presume the court found all facts necessary to support the order"].)[5]

Putnam acknowledges that the Burlingame Dealer Agreement does not mention the Satellite Service Agreement, but cites certain passages in the Satellite Service Agreement that refer to the Burlingame Dealer Agreement or the Burlingame dealership. For example, the Satellite Service Agreement requires "that the same business entity that owns Dealer [i.e., Putnam] shall, for the term of this Agreement, wholly own the Satellite Service Facility" and that "[if] Dealer should sell . . any of its ownership interest in the Primary Dealership, or in the Satellite Service Facility, all rights under the Agreement shall be null and void and the operation of the Satellite Service Facility shall immediately cease." (Satellite Service Agreement, §§ 3, 4.4.) The Satellite Service Agreement also states that the Satellite Service Facility "is subject to the same requirements for service operations applicable to authorized Subaru dealers as set forth in the Dealer Agreement," that "Dealer must maintain, in full force

---

[5] The parties disagree about the applicable standard of review of this issue, with Putnam arguing that de novo review is appropriate and Subaru claiming that our review should be under the substantial evidence standard. (Compare *City of Brentwood v. Department of Finance*, *supra*, 54 Cal.App.5th at p. 429 ["Whether Civil Code section 1642 applies is a question of fact for resolution by the trial court, which we review under the substantial evidence standard"]; *id.* at p. 428 [" ' "[W]here the issue is one of statutory construction or contract interpretation, and the evidence is not in dispute, the de novo standard of review applies [citation]" ' "].) We need not resolve this question because, in the circumstances of this case, the result would be the same under either standard. We do observe, however, that Putnam does cite to the testimony of a witness at the first arbitration hearing in arguing that the two agreements should be considered together.

effect, a current and executed Dealer Agreement and be in full compliance with [that agreement]," and that the Satellite Service Facility would terminate upon, inter alia, "[t]he termination, expiration, or cancellation for any reason of the Dealer Agreement . . . ." (Satellite Service Agreement, §§ 5.1, 7.1, 9.1(A); see also § 5.8.)

This language reflects the parties' understanding that the Satellite Service Facility could not exist on its own, without there also being a primary dealership, and that Putnam must abide by the same requirements applicable to all Subaru dealers' service operations. The Satellite Service Agreement, however, contains numerous additional terms applicable only to the Satellite Service Facility, including, inter alia, Putnam's specific obligations related to that facility; its service and parts operations; financial requirements; and grounds for termination of the agreement.

In addition, while the two agreements were first entered into on the same date, March 25, 2009, they were subject to different terms for renewal. Specifically, the 2009 Satellite Service Agreement was extended after its initial five-year term, and therefore remained in effect for the Satellite Service Facility. On the other hand, the parties repeatedly entered into new Burlingame Dealer Agreements for the Burlingame Facility, most recently (according to the record on appeal) for a three-year term starting in 2017, approximately eight years after the parties entered into the operative Satellite Service Agreement.

It is also significant that the Burlingame Dealer Agreement, unlike the Satellite Service Agreement, contains relatively few individualized provisions. Instead, it incorporates by reference Subaru's "Standard Provisions," consisting of 25 pages of detailed

12

requirements and procedures for dealership operations that are applicable to all Subaru dealerships.[6]

Most importantly, in pointing to provisions in the Satellite Service Agreement that purportedly demonstrate the parties' intent to treat the two agreements as one, Putnam ignores language in the first section of the Satellite Service Agreement that explicitly contradicts its claim. Under the heading, "Purpose," the Satellite Service Agreement states: "This Agreement states the rights and responsibilities of Dealer and Distributor with respect to the Satellite Service Facility to be operated by Dealer in Downtown San Francisco. Pursuant to the Subaru Dealer Agreement . . . , Dealer currently operates an authorized Subaru dealership located [in Burlingame]. Dealer now seeks to operate an additional Subaru service facility in Downtown San Francisco . . . . Distributor hereby approves Dealer's operation of the Satellite Service Facility pursuant to the terms of this Agreement. In consideration for Distributor's approval of the Satellite Service Facility, and provided Dealer, at all times during the term of this Agreement, satisfies the terms and conditions of this Agreement, Distributor shall consent to Dealer's continued operation of the Satellite Service Facility. . . .

_____

[6] The first term of the Standard Provisions portion of the Burlingame Dealer Agreement provides in relevant part: "The following Standard Provisions are a part of, and are incorporated by reference into the Subaru Dealer Agreement between Dealer and Distributor . . . and shall apply to and govern the transactions, dealings, and relations between Distributor and Dealer . . . . The Agreement and these Standard Provisions were developed for use by all Subaru dealers to ensure a degree of nationwide uniformity in Subaru operations. . . ." (Burlingame Dealer Agreement, Standard Provisions, § 1.1.)

13

"*Neither this Agreement, nor the termination of this Agreement, modify (modifies) the [Burlingame] Dealer Agreement entered into by [Subaru and Putnam] . . . . The parties agree that this Agreement is a separate, negotiated contract apart from the [Burlingame] Dealer Agreement, and is supported by consideration separate and apart from the [Burlingame] Dealer Agreement.*" (Satellite Service Agreement, § 1, italics added.)

This language in the "Purpose" portion of the Satellite Service Agreement "clear[ly] and explicit[ly]" reflects "the mutual intent of the parties" for the Satellite Service Agreement to be a separate contract from the Burlingame Dealer Agreement. (*Fuentes, supra,* 26 Cal.App.5th at p. 549; see Civ. Code, §§ 1636, 1642; cf. *Hartford Accident & Indem. Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1300 ["Civil Code section 1642 is simply one of the rules referred to in Civil Code section 1637[7] for aiding in the interpretation of a contract when the intent of the parties is 'otherwise doubtful' "].)

Putnam nevertheless points to statements in the arbitrator's choice of law order that supposedly demonstrate the arbitrator's belief that the Satellite Service Agreement and the Burlingame Dealer Agreement were not separate contracts. The arbitrator did find, as Putnam observes, an "express, contractual connection between the Dealer Satellite Service Agreement and the Dealer Agreement" which "establishes that Subaru entered into the Dealer Satellite Service Agreement with Putnam in Putnam's capacity as a Subaru franchisee."

---

[7] Civil Code section 1637 provides: "For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied."

14

It is apparent, however, that in making this statement the arbitrator was not addressing whether the Satellite Service Agreement and the Burlingame Dealer Agreement were separate contracts. Rather, he was determining "whether there can be a *separate* warranty service franchise agreement" under section 331, which was a necessary precondition to his ultimate conclusion that Putnam had "entered into the Dealer Satellite Service Agreement in its capacity as an authorized Subaru new motor vehicle dealer," which meant, "as a matter of choice of law," that "section 3060 and its good cause requirement apply to any attempt by [Subaru] to terminate the Dealer Satellite Service Agreement."[8] (Italics added.)

---

[8] As the arbitrator explained, to constitute a franchise under the Vehicle Code, "the warranty service agreement can be a contract separate and apart from a motor vehicle dealership franchise agreement, but the warranty repair facility provided for in the warranty service agreement must have been entered into in that person's capacity as a new motor vehicle franchisee of the same manufacturer or distributor."

Under section 331, subdivision (a)(2), a "franchise" is a written agreement in which, inter alia, "[t]he franchisee is granted the right to offer for sale or lease, or to sell or lease at retail new motor vehicles . . . manufactured or distributed by the franchisor or the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities," which differs from the definition of "motor vehicle franchise contract" in the Fairness Act. (See 15 U.S.C. § 1226(a)(1)(B) ["the term 'motor vehicle franchise contract' means a contract under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles"].) Thus, when the arbitrator found that the Satellite Service Agreement was a franchise under California law, he was referring to that term as it is defined in the Vehicle Code only.

15

Putnam also ignores additional statements in the choice of law order that contradict its assertion that the arbitrator found that the two agreements were not separate. For example, the arbitrator acknowledged that the trial court had "ruled implicitly if not explicitly that the . . . Satellite Service Agreement is a separate agreement from the Burlingame dealership agreement because it ordered this matter to arbitration" and that, "[h]ad the court considered the Dealer Satellite Service Agreement to be a part of the Burlingame dealership agreement (as is the warranty service facility operated at the location of the Burlingame dealership), the exception to arbitration under the Federal Arbitration Act and the California Vehicle Code would have applied to prevent arbitration of this matter."

In sum, based on the language of both the Satellite Service Agreement as whole—including the unambiguous statement in the "Purpose" section of the agreement that it was "a separate, negotiated contract apart from the Dealer Agreement"—and the Burlingame Dealer Agreement, we find that the two agreements were *not* intended to constitute a single contract. They therefore cannot be considered together for purposes of the Fairness Act's narrow exception to the FAA. (See *Fuentes, supra,* 26 Cal.App.5th at pp. 548–549; *Hartford Accident & Indem. Co. v. Sequoia Ins. Co., supra,* 211 Cal.App.3d at p. 1300; §§ Civ. Code, 1636, 1637, 1642.)[9] We agree with the trial

---

[9] Putnam cites several cases from other jurisdictions for their recognition of "the principle of law that agreements can be taken together for purposes of the [Fairness Act]." While this is a correct general principle, these cited cases simply looked to the various terms of the agreements at issue to determine the parties' intent, just as we have done in this case. (See *Arciniaga v. General Motors Corp.* (2d Cir. 2006) 460 F.3d 231; *Pride v. Ford Motor Co.* (N.D.Miss. 2004) 341

court's implicit finding that the Satellite Service Agreement is a separate contract, on which it based its finding that the agreement does not come within the Fairness Act's definition of a motor vehicle franchise contract because it is not a contract under which motor vehicles are both serviced and sold. (See 15 U.S.C. § 1226(a)(1)(B) & (a)(2).)[10]

## B. *Jurisdiction to Arbitrate Under California Law*

Putnam next points to California law, specifically sections 3060 and 11713.3, in support of its claim that the Board, not the arbitrator had jurisdiction over its dispute with Subaru.

"Section 3000 et seq. and section 11700 et seq. establish a statutory scheme regulating the franchise relationship between vehicle manufacturers and distributors, and their dealers. [Citation.] The purpose of this scheme is ' "to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor

---

F.Supp.2d 617; see also *General Motors, LLC v. Hall Chevrolet, LLC* (E.D.Va. 2015) 2015 WL 6830309 at p. *6 [parties intended an exclusivity contract to be separate from a dealer agreement to which exclusivity contract made multiple references and relied on for some terms, based in part on facts that exclusivity contract was a separately negotiated contract for which separate consideration was paid and each contract was for a separate term of years, with dealer agreement requiring frequent renegotiation].)

[10] In its order on Subaru's motion to compel arbitration, the court found that the Burlingame Dealer Agreement, by contrast, *was* covered by the Fairness Act's exception to arbitration, since it "regards the sale and service of motor vehicles," i.e., is a motor vehicle franchise contract. (See 15 U.S.C. § 1226(a)(1)(B), (a)(2).) The court therefore denied Subaru's request to "compel Putnam to dismiss its New Motor Vehicle Board protests, because discontinuing the service agreement might be found to modify—and/or, less plausibly, terminate—the dealer agreement," over which the Board would have jurisdiction.

and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally." ' (Historical and Statutory Notes, 65B West's Ann. Veh. Code (2000 ed.) foll. § 3000, p. 371; citation.)" (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., supra,* 221 Cal.App.4th at p. 877.)

The relevant statutes include section 331, which defines a "franchise" as "a written agreement between two or more persons [meeting certain listed] conditions"; section 331.1, which defines a "franchisee" as "any person who, pursuant to a franchise, receives new motor vehicles . . . from the franchisor and who offers for sale or lease, or sells or leases the vehicles at retail or is granted the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities"; and section 331.2, which defines a "franchisor" as "any person who manufactures, assembles, or distributes new motor vehicles . . . and who grants a franchise."

In addition, section 3050, subdivision (c), states that the Board shall, inter alia, "[h]ear and decide, within the limitations and in accordance with the procedure provided, a protest presented by a franchisee pursuant to Section 3060 . . . ." Section 3060 prohibits a franchisor from terminating a franchise unless it gives the franchisee and the Board written notice of the proposed termination, establishes "good cause" for the termination, and gives the franchisee the right to file a protest. (§ 3060, subds. (a)(1), (2).) In addition, after a protest has been filed with the Board, "the franchisor may not terminate or refuse to continue until the [B]oard makes its findings." (§ 3060, subd. (a)(2).) Section 3061 sets forth a list of nonexclusive factors for the

18

Board to consider when determining whether a franchisor has established good cause for terminating a franchise.

Finally, section 11713.3 sets forth a list of acts that are unlawful when committed by a vehicle manufacturer or distributor against a dealer, including termination of "a franchise in violation of Article 4 (commencing with Section 3060) . . . of Chapter 6 of Division 2." (§ 11713.3, subd. (*l*).)

Putnam again contends the arbitrator lacked subject matter jurisdiction under state law to determine whether Subaru had good cause for terminating the Satellite Service Agreement because all such determinations must be made by the Board, pursuant to the New Motor Vehicle Board Act, as reflected in the language of section 3060, subdivision (a)(2), which provides for a franchisee to file a protest with the Board and precludes a franchisor from terminating a franchise until the Board determines whether the franchisor had good cause to do so, following a hearing. Moreover, according to Putnam, the trial court wrongly found that section 11713.3, subdivision (g) permitted arbitration of Putnam's protest, notwithstanding the language in section 3060.

In its order granting Subaru's petition to confirm the final arbitration award, the trial court stated: "Putnam says the arbitrator should have stopped arbitrating after his April 2019 [choice of law] order, because the New Motor Vehicle Board has 'exclusive jurisdiction' to adjudicate whether good cause exists not to continue a franchise agreement. However, the very statutory subdivision Putnam cites— [section 11713.3, subdivision (g)]—provided to the contrary: 'This subdivision does not, however, prohibit arbitration before an

19

independent arbitrator.' " The court noted that "[t]his law applied to 'any contract entered into on or before December 31, 2011' [§ 11713.3, subd. (g)(3)(D)], and the Agreement was entered in 2009."

We agree with the trial court's conclusion. Putnam's claim that the Board had exclusive jurisdiction over its termination protest and that subdivision (g) of section 11713.3 prohibited enforcement of the arbitration provision is based on a complete misreading of that subdivision.

First, as the trial court stated, the version of section 11713.3, subdivision (g) that was in effect when the parties entered into the Satellite Service Agreement in 2009, and which was still the operative agreement when this dispute arose, provided in relevant part:

"It is unlawful and a violation of this code for any manufacturer . . . licensed under this code to do any of the following: [¶] . . . [¶]

"(g) To require . . . any controversy between a dealer and a manufacturer [or distributor] to be referred to any person other than the board, if the referral would be binding on the dealer. *This subdivision does not, however, prohibit arbitration before an independent arbitrator.*" (Former § 11713.3, subd. (g), italics added.)

Thus, the applicable version of the statute expressly excepts an agreement to arbitrate from the prohibition against any controversies between dealers and manufacturers or distributors being referred to anyone other than the Board. The applicability of former section 11713.3, subdivision (g) to the 2009 Satellite Service Agreement is also reflected in language of the current version of the statute, which provides in relevant part:

20

"It is unlawful and a violation of this code for any manufacturer [or distributor] licensed pursuant to this code to do . . . any of the following:  [¶] . . . [¶]

"(g)(1) *Except as provided in paragraph 3*, to obtain from a dealer or enforce against a dealer an agreement [or] provision . . . that does any of the following:  [¶] . . . [¶]

"(D) Requires a controversy between a manufacturer [or a distributor] and a dealer to be referred to a person for a binding determination. . . ."

"(3) *This subdivision does not do any of the following*:  [¶] . . . [¶]

"(D) *Affect the enforceability of a provision in any contract entered into on or before December 31, 2011*."  (§ 11713.3, subds. (g)(1)(D) & (g)(3)(D), italics added.)[11]

Thus, the current statute makes clear that arbitration provisions in contracts entered into before 2012 are governed by former section 11713.3, which expressly "does not . . . prohibit arbitration before an independent arbitrator" in any circumstances.  (Former § 11713.3, subd. (g).)[12]

---

[11] The language in current section 11713.3, subdivision (g) was added in an amendment, with an effective date of January 1, 2012 (see Stats. 2011, ch. 342, § 3).  Former section 17313.3, subdivision (g) was in effect when the parties entered into the Satellite Service Agreement (see Stats. 2006, ch. 353, § 1).

[12] Putnam asserts that because the Satellite Service Agreement was extended in 2014, subdivision (g)(3)(D) of current section 11713.3 is inapplicable.  It is apparent from the record, however, that the parties, the trial court, and the arbitrator considered the 2009 Satellite Service Agreement—which was extended but never replaced—the operative agreement.  Putnam also asserts that because Subaru sought to enforce the arbitration provision in the Satellite Service Agreement against Putnam after December 31, 2011, "even if obtaining the agreement

21

Second, the provision in the current version of section 17313.3, subdivision (g), on which Putnam relies, also fails to support its claim that the Board had sole jurisdiction to resolve the present dispute.

Subdivision (g)(1)(D) of section 11713.3 provides that, except as provided in subdivision (g)(3), it is unlawful for a vehicle manufacturer or distributor to enforce an agreement that requires a controversy with "a dealer to be referred to a person for a binding determination." (§ 11713.3, subd. (g)(1)(D).) Importantly, this provision then states: "However, *this subparagraph does not prohibit arbitration before an independent arbitrator*, provided that whenever a *motor vehicle franchise contract* provides for the use of arbitration to resolve a controversy arising out of, or relating to, that contract, arbitration may be used to settle the controversy only if, after the controversy arises, all parties to the controversy consent in writing to use arbitration to settle the controversy. *For the purpose of this subparagraph, the terms 'motor vehicle' and 'motor vehicle franchise contract' shall have the same meanings as defined in Section 1226 of Title 15 of the United States Code. . . .*" (§ 11713.3, subd. (g)(1)(D), italics added.)

Subdivision 11713.3 thus tracks the language of the Fairness Act, providing a limited exception to enforcement of arbitration agreements for motor vehicle franchise contracts, as that phrase is defined in that Act. (See 15 U.S.C. § 1226(a)(1)(B).) In addition, just as the Fairness Act permits arbitration to resolve a controversy relating to a motor

prior to December 31, 2011 was considered lawful, attempting to enforce the agreement after December 31, 2011, is a separate unlawful act." Putnam disregards the plain language of the statute, which, again, provides that subdivision (g) does not "[a]ffect the *enforceability* of a provision in any contract *entered into* on or before December 31, 2011." (§ 11713.3, subd. (g)(3)(D), italics added.)

vehicle franchise contract "only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy" (15 U.S.C. § 1226(a)(2)), subdivision (g)(1)(D) of Vehicle Code section 11713.3 uses nearly identical language, permitting arbitration to settle a controversy arising from a "motor vehicle franchise contract" "only if, after the controversy arises, all parties to the controversy consent in writing to use arbitration to settle the controversy."

Thus, by including in section 11713.3, subdivision (g) virtually the same language as that in the Fairness Act's narrow exception to arbitration of motor vehicle related disputes, the Legislature avoided conflict with the FAA, since any broader categorical attempt to reserve otherwise arbitrable disputes for resolution by a state-established administrative board would necessarily be subject to preemption by the FAA. (See *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 351 (*Concepcion*) ["States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons"]; see also *Preston v. Ferrer* (2008) 552 U.S. 346, 356 [California Labor Code section giving Labor Commissioner exclusive original jurisdiction over certain disputes "conflict[ed] with the FAA's dispute resolution regime" by "grant[ing] the Labor Commissioner exclusive jurisdiction to decide an issue that the parties agree to arbitrate"]; *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1124 [holding, in light of *Concepcion*, that FAA preempted a state law rule categorically prohibiting waiver of a "Berman hearing" (i.e., "a dispute resolution forum established by the

23

Legislature to assist employees in recovering wages owed") in a predispute arbitration agreement].)[13]

We have already determined, in part I.A., *ante*, that the Satellite Service Agreement is *not* a motor vehicle franchise contract covered by the Fairness Act's exception to arbitration because it is not a contract under which vehicles are serviced *and* sold. Likewise, the nearly identical prohibition against involuntary arbitration of disputes contained in subdivision (g)(1)(D) of section 11713.3 is inapplicable to the Satellite Service Agreement. The portion of subparagraph (D) that *would* be applicable to the Satellite Service Agreement (were the agreement not excepted from the requirements of current subdivision (g)(1)(D)) provides that "this subparagraph does not prohibit arbitration before an independent arbitrator . . . ." (§ 11713.3, subd. (g)(1)(D).)

In short, notwithstanding the language Putnam cites in section 3060 regarding the Board's authority to make good cause determinations, under both former and current section 11713.3, subdivision (g), the arbitration provision in the Satellite Service Agreement controls.

## II. *Legality of the Arbitration Provision Under Section 11713.3*

Putnam next contends that, regardless of whether the parties' agreement to arbitrate in the Satellite Service Agreement was otherwise valid, the arbitrator exceeded his powers "by rendering an award where the underlying agreement to arbitrate is illegal." (See

---

[13] As the arbitrator noted in his final award, "[t]he obvious purpose of Section 11713.3[, subdivision] (g) is to limit the exception from pre-dispute arbitration agreements to the statutory exemption provided in 15 U.S.C. [section] 1226."

24

*Loving & Evans v. Blick* (1949) 33 Cal.2d 604, 610 [cited by Putnam, in which Supreme Court stated: "[I]t is generally held that 'a claim arising out of an illegal transaction is not a proper subject matter for submission to arbitration, and that an award springing out of an illegal contract, which no court can enforce, cannot stand on any higher ground than the contract itself' "]; see also *Concepcion*, *supra,* 563 U.S. at p. 339 [FAA contains a savings clause that "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract' "]; *O'Flaherty*, *supra*, 115 Cal.App.4th at pp. 1055–1056 [" 'An arbitrator exceeds his powers when he . . . upholds an illegal contract' "].)

According to Putnam, the arbitration provision in the Satellite Service Agreement was illegal under two terms of current section 11713.3 that do not specifically target arbitration, but instead "prohibit any interference with Putnam's rights to pursue the protests before the Board and make unlawful agreements requiring Putnam to terminate its franchise." These two subparagraphs make it unlawful for a vehicle manufacturer or distributor to enforce against a dealer an agreement that "[l]imits or constrains the right of a dealer to file, pursue, or submit evidence in connection with a protest before the board" (§ 11713.3, subd. (g)(1)(B)) or that "[r]equires a dealer to terminate a franchise" (§ 11713.3, subd. (g)(1)(C)).

In its order confirming the final arbitration award, the trial court addressed this contention, as follows: "Putnam belatedly argues that two other [section 11713.3, subdivision (g)] provisions rendered the Agreement's arbitration clauses 'illegal.' One bars a manufacturer from limiting a dealer's evidence *if* there is 'a protest before the board.'

25

(*Id.* at (1)(B).)  The other keeps a manufacturer from requiring a dealer 'to terminate a franchise,' which clearly means terminate without legal process.  (*Id.* at (1)(C).)  Neither provision bars arbitration."  We agree with the trial court's interpretation of these two provisions.

First, considering our conclusion that arbitration *is* permitted under both the current and former versions of section 11713.3 (see pt. I.B., *ante*), it would be absurd to then construe subdivision (g)(1)(B) in isolation as forbidding arbitration and requiring that all protests be heard solely by the Board.  (See, e.g., *Star Athletica, L.L.C. v. Varsity Brands, Inc.* (2017) 137 S.Ct. 1002, 1010 (*Star Athletica*) [" '[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning' "]; *Satele v. Superior Court* (2019) 7 Cal.5th 852, 858 (*Satele*) ["We consider [statutory] language in the context of the entire statute and the statutory scheme of which it is a part"].)  In context, the provision precludes a manufacturer or distributor from limiting a dealer's right to submit evidence "in connection with a protest," *if* that protest is "before the Board."  (§ 11713.3, subd. (g)(1)(B); see also *Star Athletica*, at p. 1010; *Satele*, at p. 858.)

As to subdivision (g)(1)(C) of section 11713.3, this provision obviously is not a blanket prohibition against a manufacturer or distributor "[r]equir[ing] a dealer to terminate a franchise."  As the trial court stated, the provision bars such a termination "without legal process."  Putnam's argument that this provision makes it illegal to require a dealer to submit a dispute to arbitration, through which it might be required to terminate a franchise, ignores both common sense and the context of this provision within the statute as a whole, which

26

allows disputes to be resolved by arbitration in circumstances that we have found applicable here.  (See § 11713.3, subd. (g)(1)(D), (3)(D); see also *Star Athletica, supra*, 137 S.Ct. at p. 1010; *Satele, supra*, 7 Cal.5th at p. 858.)

Accordingly, considering these provisions in the context of the entire statute, neither one makes illegal the enforcement of the parties' agreement to arbitrate their disputes.

### III.  *Arbitrator's Good Cause Determination and Public Policy*

Putnam contends the arbitrator exceeded his powers when he made a good cause determination in his final award, contrary to the public policy underlying the New Motor Vehicle Board Act and the Fairness Act.  (See Code Civ. Proc., § 1286.2, subd. (a)(4); *O'Flaherty, supra*, 115 Cal.App.4th at pp. 1055–1056 [" 'An arbitrator exceeds his powers when he . . . issues an award that violates a well-defined public policy' "].)

Putnam cites to the purpose of both the Fairness Act and the New Motor Vehicle Board Act, maintaining that permitting arbitration of the parties' dispute undermines the intent of both Acts, which were created to protect motor vehicle dealers from unfair trade practices by manufacturers or distributors and to ensure that dealers have the opportunity to exercise their rights before specialized state boards.  (See Sen.Rep. No. 107-266, 2d sess. (2002); see also *Ri-Joyce, Inc. v. New Motor Vehicle Board* (1992) 2 Cal.App.4th 445, 456, fn. 4 [New Motor Vehicle Board Act "was intended to protect new motor vehicle dealers against unfair or oppressive trade practices"].)

As we have explained, however, both the Fairness Act and Vehicle Code exceptions to arbitration, by their terms, apply only to

27

motor vehicle franchise contracts as defined in title 15 of the United States Code section 1226(a)(1)(B), and the Satellite Service Agreement is not such a contract. (See pt. I., *ante*; see also *Lopez v. Sony Electronics, Inc.*, *supra*, 5 Cal.5th at pp. 633–634 [if statutory language is unambiguous, plain meaning of statute controls, and resort to Legislature's intent is unnecessary].)

Putnam nonetheless asserts that "[i]f the award is not vacated, it will be the *first and only* termination of a franchise in California since the enactment of [section] 11713.3[, subdivision] (g) where the franchisor was not required to prove good cause before the Board," and that this "will set a dangerous precedent of allowing manufacturers to separate sales and service agreements and circumvent the Board's jurisdiction by seeking to terminate the service portions of those agreements by way of arbitration and not before the Board." But Subaru was *not* attempting to terminate the "service portion[]" of a larger dealer agreement. We have found that the Satellite Service Agreement and the Burlingame Dealer Agreement are separate contracts, and that only the Burlingame Dealer Agreement comes within the Fairness Act and section 11713.3's narrow exception to arbitration, because it is a contract under which vehicles are both serviced and sold. (See 15 U.S.C. § 1226(a)(1)(B); Veh. Code, § 11713.3, subd. (g)(1)(D); see also pt. I., *ante*.) We are not permitted to second-guess Congress's decision to create the Fairness Act's narrow exception to the FAA, which by its terms does not apply to the Satellite Service Agreement. (See *Concepcion*, *supra*, 563 U.S. at p. 351; *Preston v. Ferrer*, *supra*, 552 U.S. at p. 356; *Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1124.)

Finally, Putnam questions the basis for the arbitrator's finding of good cause, asserting that the finding "is disconnected from how the Board views good cause" and that the arbitrator "bases a central portion of his decision on the idea [that Subaru] can deny Putnam's request to relocate to a larger facility, but then use Putnam's inability to relocate to a larger facility as a basis for finding good cause to terminate." This argument is essentially an attempt to call into question the factual and legal findings of the arbitrator, which is impermissible. (See *Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at p. 11.)[14]

## IV. *Alleged Due Process Violation*

Putnam contends Subaru's failure to provide notice of the reasons for its nonrenewal of the Satellite Service Agreement requires that the final award be vacated because Putnam's due process rights "were substantially prejudiced . . . by other conduct of the arbitrator[] contrary to the provisions of this title." (Code Civ. Proc., § 1286.2, subd. (a)(5).)

Section 3060, subdivision (a) provides that "no franchisor shall terminate or refuse to continue any existing franchise unless . . . [¶] (1) The franchisee and the board have received written notice from the franchisor as follows:  [¶] (A) Sixty days before the effective date thereof setting forth the specific grounds for termination or refusal to continue." (§ 3060, subd. (a)(1)(A); see *American Isuzu Motors v. New Motor Vehicle Bd.* (1986) 186 Cal.App.3d 464, 477 ["To permit a franchisor to later raise additional unspecified grounds at the [good

---

[14] We also note that the arbitrator engaged in a detailed analysis and weighing of the relevant factors set forth in section 3061 before making his good cause determination, as set forth in the final award.

cause] hearing would be to deny the franchisee the notice prior to hearing guaranteed under [section 3060, subdivision (a)]; such denial infringes on the franchisee's right to procedural due process and cannot be allowed"].)

## A. *Background*

In his final award, the arbitrator included a summary of the correspondence between the parties concerning Subaru's decision not to extend the Satellite Service Agreement for an additional five years: "Following the September 13, 2013 extension, [Putnam] attempted to engage [Subaru] with regard to relocating the downtown San Francisco satellite service facility. However, as evidenced by [Putnam's] letter of September 7, 2017, [Putnam] conditioned its proposed relocation on obtaining a 'standard dealer agreement' for the new location. [Citation.] [Subaru] rejected [Putnam's] proposal by letter, dated November 6, 2017: 'Per our discussions regarding your recent proposal(s) for relocation of the Downtown Service Point, [Subaru] will not approve any move of the current facility, nor will [Subaru] participate financially in the purchase or remodel of a new facility. Our intent remains to serve-out the remainder of the service agreement between Putnam Automotive and [Subaru], and we will not renew our agreement at that time.' [Citation.] Thereafter, on September 7, 2018, [Subaru] sent [Putnam] a letter confirming that '[Subaru] will not renew the Service Agreement when it expires on or about March 24, 2019. In light of the existing circumstances in the applicable market area, and giving due consideration to all such circumstances, [Subaru] has determined that not renewing the Service Agreement will better

30

serve the brand, the retailer network and Subaru customers over the longer term.' [Citation.]"

Near the conclusion of the second arbitration hearing, the following exchange, referred to by the trial court in its order confirming the final arbitration award,[15] took place between the arbitrator and counsel for Putnam regarding Putnam's notice of Subaru's reasons for termination of the Satellite Service Agreement. The arbitrator first asked if counsel had had "a full and fair opportunity to present everything you wanted to support your case," to which Putnam's counsel responded, "The only written statement of why this dealership has ever been terminated is the expiration of the term. So we have had an adequate opportunity to respond to all of the evidence that was testified to here today." After counsel affirmed that "we do have actual knowledge of what their arguments are for termination now at the hearing," the arbitrator asked, "do you need something else—some other procedures—some other witnesses, some other time to respond to the reasons that you have heard?" Counsel responded, "I don't believe so."

In his final award, the arbitrator further addressed the notice issue, first stating that although the reasons Subaru gave for nonrenewal of the Satellite Service Agreement "are rather broad, considerable leeway should be afforded here because of the unusual posture of this case and the extensive back-and-forth between [Subaru]

---

[15] The trial court stated in its order that "Putnam also belatedly claims it lacked notice of Subaru's reasons for the nonrenewal [of the Satellite Service Agreement]. But Putnam conceded at the arbitration that it had 'actual notice' of the reasons and 'a full and fair opportunity to present everything [it] wanted to support [its] case.' [Citation.]"

and [Putnam] regarding the adequacy of the San Francisco Downtown service facility to accommodate customers in the market area. Accordingly, I have considered [Subaru's] market/brand-based customer service reasons for non-renewal of the Dealer Satellite Service Agreement. Pursuant to my findings above, I have not considered the alleged breaches of the Dealer Satellite Service Agreement that were not specified in [Subaru's] notice of non-renewal as support for [Subaru's] decision not to renew."[16]

## B. *Legal Analysis*

Putnam now asserts that although it "gained actual knowledge of [Subaru's] grounds for proposed termination during the hearing before" the arbitrator, "the delay in receiving notice of [Subaru's] reasons for proposed termination limited Putnam's ability to prepare for the hearing." Putnam states that this is one of those " 'limited and exceptional circumstances justifying judicial review of an arbitrator's decision' " to protect a party's statutory rights. (*Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 275; see also Code Civ. Proc., § 1286.2, subd. (a)(5).)

Even assuming Putnam may now challenge the arbitrator's factual finding that Putnam had received actual notice of Subaru's ground for termination of the Satellite Service Agreement, the reporter's transcript of the arbitration hearing belies Putnam's claim that it was unable to prepare for the hearing, considering that counsel

---

[16] The arbitrator had earlier determined that it would not allow Subaru to present evidence regarding Putnam's purported breach of contract due to its failure to provide Putnam with prior notice of those grounds for termination of the Satellite Service Agreement. (See *American Isuzu Motors v. New Motor Vehicle Bd.*, *supra*, 186 Cal.App.3d at p. 477.)

responded in the negative to the arbitrator's inquiry as to whether Putnam needed "something else—some other procedures—some other witnesses, some other time to respond to the reasons that you have heard."  Moreover, as the arbitrator pointed out in the final award, the parties had engaged in "extensive back-and-forth . . . regarding adequacy of the San Francisco Downtown service facility to accommodate customers in the market area," which meant that Putnam already had actual notice of the reasons for the termination.  Considering the record as a whole, Putnam has not shown that its rights "were substantially prejudiced" by the arbitrator's alleged failure to abide by section 3060's notice requirements when it proceeded with the arbitration.  (Code Civ. Proc., § 1286.2, subd. (a)(5).)

In conclusion, for all of the reasons discussed in this opinion, the trial court correctly granted Subaru's petition to compel arbitration and its subsequent petition to confirm the arbitrator's final award.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to Subaru.

_____

                                        Kline, P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*Subaru of America, Inc. v. Putnam Automotive, Inc.* (A159686)

34

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Richard B. Ulmer |
| Attorneys for Appellant: | Law Offices of Gavin M. Hughes<br>Gavin M. Hughes<br>Robert A. Mayville, Jr. |
| Attorneys for Respondent: | Nelson Mullins Riley & Scarborough<br>Lisa M. Gibson<br>Crispin L. Collins |